631 So.2d 479 (1994)
Glenda DAVIS
v.
SCHWEGMANN GIANT SUPER MARKETS.
No. 92-CA-2051.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1994.
*480 Harry E. Cantrell, Jr., New Orleans, for plaintiff-appellee.
Robert E. Caraway, III, Blue Williams, L.L.P., Metairie, for defendant-appellant.
Before BARRY and KLEES, JJ., and JAMES C. GULOTTA, J. Pro Tem.
BARRY, Judge.
Schwegmann Giant Super Markets, Inc. (Schwegmann) appeals a judgment which awards $3,945.00 to Glenda Davis for injuries from an alleged slip and fall in its store. Schwegmann's assignments are:
Ms. Davis' testimony is unbelievable and she is incompetent;
Schwegmann's investigative records were improperly excluded as inadmissible hearsay, leading to an erroneous finding of liability.

TESTIMONY
Ms. Davis testified that on July 9, 1986 while in the egg section of Schwegmann she slipped on some egg white, although she did not see a broken egg in the area. She demonstrated how her right leg went under the left leg, causing her to land on her right side. Ms. Davis stated that several Schwegmann employees helped her up and escorted her to an office in the front of the store. She was told to see her family doctor, but she did not recall filling out or signing a form. Ms. Davis was told she could leave.
Ms. Davis testified that after the fall she felt immediate pain up her right leg and especially in the ankle. By the time she walked home the ankle was swollen so she made an appointment to see her family doctor the next day. Ms. Davis said Dr. Curtis Bonin briefly examined her ankle and told her he didn't handle that type of injury, and she should see another doctor. She went to Gulf Coast Medical Consultants and after an examination and x-rays, heat treatments and pain medication were prescribed. Ms. Davis testified that the injury improved but she had occasional severe pain in her ankle and up her right side.
On cross examination Ms. Davis said that she had attended Southern University for three years. She reiterated that she saw nothing on the floor before the fall, and she believed that she slipped on egg white because of the "slimy" feel on her arm and leg. Ms. Davis stated that she had no problem with her left ankle, leg or side.
*481 When Ms. Davis was shown Schwegmann's form, "Loss Notice" she acknowledged her signature at the bottom, but denied that she told anyone that she slipped but did not fall, as stated on the form. She remembered being deposed in May 1987 but could not explain her statement that "about ten eggs" were on the floor or why she said that she and her niece were "clowning around" when she fell, and she now testified that her niece was elsewhere in the store when the incident occurred.
Ms. Davis' cross examination was interrupted to hear the testimony of Dr. Curtis Bonin, a board certified family practitioner. He had seen Ms. Davis on July 10, 1986 because of a reported slip and fall due to water on the floor at Schwegmann on July 8. She told Dr. Bonin that she landed on her left side which caused severe pain. He found tenderness from the lower back and left buttock to her ankle, according to a drawing he'd made in his notes. Dr. Bonin testified that although there was no obvious swelling, his exam was limited because Ms. Davis cried with pain when he tried to move her leg. He also found her muscles were very tight during the exam. The diagnosis was lumbosacral sprain and contusions of the left lower extremity. Dr. Bonin admitted it was possible for his notes to show "left side" when the patient's complaints were about the right side, saying "I very seldom do it but I've been known to have done it." Dr. Bonin's records were admitted into evidence as Exhibit # 1.
Cross examination of Ms. Davis resumed after Dr. Bonin's testimony and a recess for lunch. She again acknowledged her signature on the Loss Notice and repeated that she did not remember the form, or that it was given for her to read and sign following the incident. Ms. Davis was allowed to read the document and agreed that it was accurate.
When questioned by Schwegmann's counsel about prior medical problems, the trial judge instructed Ms. Davis to consult with her attorney before answering the question. Ms. Davis then testified that at some time prior to the fall Charity Hospital had diagnosed a fibroid tumor on the left side of her brain but she refused surgery. She said that the tumor caused memory loss, difficulty in telling right from left and up from down, and intermittent severe headaches:
Ms. Davis: ... the headaches just take control where I tune everything out, where I may not understand what you are saying, I have to sit and look at you about twice and really come back to myself, that is how.
Counsel: Have you had any of those headaches while we have been here in Your Honor's [sic] court?
Ms. Davis: Yes I have.
Counsel: Is it your testimony right now that those headaches have influenced or changed testimony in any way?
Ms. Davis: Yes, the first time, yes it have [sic].
* * * * * *
Counsel: Are you having a headache right now as we are talking?
Ms. Davis: Yes I am.
* * * * * *
Counsel: Is there any testimony that you are aware of as we sit here right now that you would like to change because you felt like you really weren't able to focus on either of the questions that you were asked today?
Ms. Davis: Left from right, like if you may tell me to stand up and tell me to point to my left eye, I can see you saying to my left, but point to my right. I may be on myto point, my mind just go toward my left and the whole, while it's my right, where it could be my right, I could be pointing to my left, but suddenly I'll just say right, or it be like a crisscross.
Ms. Davis testified that she did not mention the tumor to her attorney until their conversation in the courtroom.
Schwegmann's counsel moved to strike Ms. Davis' testimony, arguing that her description of her condition established her incompetency as a witness. The trial court denied the motion.
*482 When asked to raise her right hand, Ms. Davis raised her left hand. When questioned again about where she was hurt after the alleged fall, she stated her left side. She said she didn't tell any of the doctors about the tumor or its effects because she felt it was not related to the fall and only the doctor at Charity knew about the tumor. On redirect, Ms. Davis testified that the tumor was diagnosed on her birthday in June, but she couldn't remember what year. She said she had never been declared mentally incompetent.
Records from Gulf Coast Medical Consultants were introduced into evidence through the testimony of Dr. Joseph Gunther. He testified that Ms. Davis was first seen at the clinic on August 14, 1986 because of pain on her left side from a fall at Schwegmann on July 10, 1986. She reported a prior medical history of asthma, hypertension and removal of fibroids on the left ovary in 1983. After xrays and an examination by Dr. Anil Kumar, Ms. Davis was diagnosed as suffering from a cervical strain, bilateral trapezius strain, lumbar strain and left ankle strain. She received nine therapy sessions within the next month and three more office exams, one of which was by Dr. Gunther. She was last seen November 12, 1986 by Dr. Phillip A. Jones, still complaining of back pain but with full range of motion in her cervical and lumbar spine. On that date, Dr. Jones diagnosed Ms. Davis as having Bell's Palsy. Further questioning of Dr. Gunther about this condition was prohibited by the court, since the diagnosis was by Dr. Jones.
Elijah Watson, assistant manager of Schwegmann in 1986 and now manager, testified that when a customer accident occurs a security guard and the manager are called to the scene immediately. The security guard takes the customer to security and records the customer's description of what happened on a Loss Notice form. He also prepares a Security Officer's Investigative Report, which may include statements of witnesses. Completion of those documents is routine for security personnel and records are kept of all incidents.
Mr. Watson said he neither witnessed the alleged incident nor participated in the investigation; he signed the bottom of the Loss Notice form when he received it. The investigating guard for this incident was former employee Michael Hughes, as shown by the signature on the Loss Notice and Investigative Report taken from Schwegmann's files. The Loss Notice was admitted into evidence without objection as D-3, but the trial court excluded the Investigative Report, marked D-4, as hearsay. Mr. Watson stated that in 1986 Schwegmann kept Log Sheets but further questioning about those records was prohibited.
While examining the Investigative Report, Mr. Watson identified Terry Foy as a security guard at the store in 1986 and at present. He said Amy Milligan, a porter in 1986, was no longer employed at Schwegmann.
Michael Hughes, a police officer, testified that in 1986 he was a security guard at Schwegmann with duties to detect thefts, preparing incident reports and investigating reported accidents. He recognized his handwriting and signatures on the Loss Notice and Investigative Report but he had no independent recollection of the reported fall. Reviewing the documents did not refresh his memory. All information in the top portion of the Loss Notice, such as the description of the accident, is furnished by the customer. He wrote down what was said, then the customer was given the form to read and sign. It was standard procedure to ask the employee responsible for cleaning the area to state when that area was last checked, so he thought that the porter would have been in the office with Ms. Davis and himself. Mr. Hughes could not recall, though, whether the time shown at the top was the time he received the signal or the time the customer said the accident occurred.
Mr. Hughes testified that the entire Investigative Report (D-4) was in his handwriting. The court prohibited further testimony about the document because "the document that is already a part of this says no witnesses, and now you're attempting to establish that through this witness. Those are the inconsistencies that cause problems with these kinds of documents...."
*483 Terry Foy, a plainclothes security officer at the store in 1986 and at present, recalled being asked by Mr. Hughes to get statements from a price checker, Amy Milligan, and a porter, Cecelia Milanes, about Ms. Davis' claim. He identified his signature as a witness to documents D-5 and D-7, and he recalled watching as the two employees wrote and signed the statements. That was standard procedure and the statements would be incorporated into the investigative file. Mr. Foy did not recall whether he had responded to the initial signal of the incident, or how long after the employees gave their statements.
In response to questioning by the trial judge, Mr. Foy said he had not seen the Loss Notice before, but he agreed that it showed there were no witnesses. He said that may have meant that she didn't know of any witnesses.
The trial court ruled that the employee statements (D-5 and D-7) and D-6 (Log Sheets) were inadmissible hearsay, and D-4 (Investigative Report) was inadmissible because Mr. Hughes' testimony made it unnecessary and because he said it did not refresh his memory. The judge also found that they were inconsistent and contained different handwritings.
Schwegmann proffered all four documents. In an attempt to establish admissibility under the business records exception to the hearsay exclusion, additional testimony was taken at a later date from Mr. Watson and Mr. Foy, but Mr. Hughes was not re-called. Schwegmann introduced Ms. Davis' Charity Hospital medical records (D-8) but no testimony was offered concerning the contents. The matter was submitted for judgment.
The trial judge ruled that Schwegmann was liable for damages in an amount to be determined after further review. In oral reasons the judge stated:
I carefully reviewed my notes of relative documents, and I am of the opinion that the plaintiff is in error when he says that I excluded D-3 [sic], the statement of C. Milanez [sic], according to my notes that statement was specifically identified by Mr. Foy, as having been done in his presence, and that he recognize(d) this handwriting to be that of Cecelia Milanez [sic] and while he refers to it as a proffer, I do not have anything that indicates that I excluded that document.
* * * * * *
(I)t's a matter of what I take into consideration because to me that statement supports all the other statements that Mrs., that Miss Davis did as a matter of fact have an accident in the store. Miss Milanez says that someone in the store, a customer came to her and told her that a lady, I'm sure she meant fell down, all she just said I see a lady down there fell on some water on the floor, that is a customer identified by Cecelia Milanez [sic] in her statement that Mr. Foy says that he saw her prepare and that statement was done on the same date of this accident. So this court concludes that Miss Davis fell in the store and she fell in something that was liquid.
* * * * * *
Now this morning I made a comment I had tried many Schwegmann cases, I suppose what I was really saying that I tried many slip and fall cases involving stores and every time ... someone representing the store goes to the spot they go to the spot for purposes of identifying whether there was anything on the floor, and that is what is missing in this case ... so everything points to the fact that ... there was something of a liquid nature on the floor.
* * * * * *
This court gives no weight whatsoever, none, to the testimony of the store manager.... On too many occasions it was obvious to this court that he was parroting that which he thought he ought to say, and that is fine, I'm not going to say that he was telling an untruth, I'm just saying he was pressed to make sure that he said the right thing and it was obvious to me, as I observed his manner as well as his facial expression. I have no problem finding liability on the part of Schwegmann.
This determination was elaborated upon in the written judgment rendered May 5, 1992:
*484 The Court permitted the defendant every opportunity to rebut the testimony of plaintiff. Plaintiff, Ms. Glenda Davis, was forthright in her testimony that she slipped on a `wet surface' in the store belonging to defendant. Defendant presented several witnesses, who claimed that the plaintiff had not conducted herself in a civil manner, but no two (2) of defendant's witnesses agreed in any significant detail regarding the occurrence so as to constitute a `believable' defense. Not a single witness called by the defendant could state unequivocally that the accident did not occur as plaintiff stated. Weighing the entire testimony of all of the witnesses, the circumstances and the nature of the injury, this Court finds that plaintiff's testimony is more credible. The Court concludes that plaintiff carried her burden of proof as to the occurrence of an accident.

COMPETENCY AND SUFFICIENCY OF PLAINTIFF
Schwegmann argues that Ms. Davis' testimony should be disregarded completely if the description of her brain tumor and its effects are believed because she was unable to testify accurately and completely. Alternatively, since Charity Hospital records contain no indication of any tumor and Ms. Davis' testimony was inconsistent, it was manifest error for the trial court to believe her at all. Schwegmann argues there was no evidence that a fall occurred other than her testimony.
Ms. Davis responds that the record shows she "demonstrated a more than adequate understanding of the questions posed to her" which is sufficient to establish her competency. She submits that her testimony was not significantly inconsistent, as shown by portions of her deposition that were not offered at trial, and it was unrebutted by any other witness. Ms. Davis asserts the trial court's reasons for judgment demonstrate a reasonable basis for the credibility determination and it is entitled to great weight.

DISCUSSION
We find no error in the ruling that Ms. Davis was competent. Ms. Davis' answers were generally responsive to the questions. This demonstration of "proper understanding" is sufficient to establish competence as a witness. C.E. art. 601.
As to Ms. Davis' credibility, it is within the sound discretion of the trial judge to observe the testimony and demeanor of all witnesses firsthand and to assess their credibility, Cascio v. Continental Casualty Co., 547 So.2d 743, 745 (La.App. 4th Cir.1989), and great deference is given to such determinations. Fortune v. City of New Orleans, 623 So.2d 701, 703 (La.App. 4th Cir.1993). Thus, credibility determinations and factual inferences which are reasonably supported by evidence may not be set aside. Stobart v. State DOTD, 617 So.2d 880, 882 (La.1993).
The trial judge was aware that Ms. Davis made conflicting statements in her deposition and trial testimony. We note that the trial judge partially relied upon the statement by Cecelia Milanes (D-7) which exhibit was excluded as hearsay. A review of the record de novo could support a finding that the plaintiff did not carry her burden of proof.
However, we are to give great deference to the factual findings of the lower court. The trial judge emphasized his total acceptance of the plaintiff's version of the alleged fall based on her credibility. Under the dictates of Rosell v. ESCO, 549 So.2d 840 (La.1989), we are constrained to affirm this determination.

LIABILITY
Once a plaintiff has shown that a hazardous condition caused her injury, the burden "shifts to the merchant to prove that he acted in a reasonably prudent manner" to prevent such an occurrence. La.R.S. 9:2800.6(A), as enacted by 1988 Acts No. 714;[1]Laborde v. Winn Dixie Louisiana, Inc., 563 So.2d 994 (La.App. 4th Cir.), writ denied, 568 So.2d 1062 (La.1990). Schwegmann contends that the proffered documents and testimony would exculpate it from liability under the statute and the trial court erroneously excluded *485 them from consideration. We disagree and pretermit discussion of Schwegmann's argument regarding admissibility.
Schwegmann relies primarily on the Log Sheets (D-6) to establish that Aisle 19 had been mopped and inspected at 3:43 p.m., five minutes before the reported fall. However, the diagram on the back of those sheets, which includes an indicator of scale, shows that Aisle 19 is about 75 feet long, and ends approximately 25 feet from the milk and egg case where Ms. Davis fell. Without the testimony of Ms. Milanes to clarify the location she had inspected and mopped in relation to the area of this accident, the record does not show that she had done so, as Schwegmann claims.
Schwegmann also argued that the Log Sheets prove that it took all reasonable precautions to prevent a customer injury because of periodic inspections. According to this document, the milk/egg/dairy section was last visited by a porter at 11:26 a.m., more than four hours before Ms. Davis fell. Such an interval does not prove that Schwegmann made "a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage" as required by R.S. 9:2800.6.
Consideration of other proffered documents does not change this conclusion. The Investigative Report (D-4) shows that Michael Hughes was called to the scene of a disturbance in section 19 and he found Ms. Davis yelling at Ms. Milanes. The report states that Ms. Davis was drinking from a large cup, and it repeats her statement that she slipped but did not fall.
The two employee statements witnessed by Terry Foy were originally attached to the Investigative Report. On the page marked D-5, Amy Milligan wrote that she was in section 18 when she heard a fuss "and I saw Mrs. C clean up before she got their [sic] in that spot but Mrs. C did not say nothing to her...." Cecelia Milanes wrote on the page marked D-7 that,
I was in section 19 the center front mopping a large spill, in the meantime a customer on the other end told me a lady down there fell on some water on the floor. When I went in the aisle the only place that had water is where I was cleaning. The lady had a large drink cup in her hand... when she left the area where I was after a few minutes when I finish cleaning and went in the other end, the customer became very abusive....
Those documents, standing alone, add nothing to Schwegmann's attempt to exculpate itself from liability. Testimony from the employees is necessary to determine the sequence of events in relation to Ms. Davis' reported fall and the employees' locations at relevant times. Michael Hughes did testify concerning completion of the Investigative Report, but his review of the document did not refresh his memory and he was unable to clarify his report. No effort was made during the trial or the subsequent proffer to call either Ms. Milanes or Ms. Milligan as a witness. Therefore, even if the trial court had admitted the documents, they are insufficient to meet Schwegmann's burden of proof.
AFFIRMED.
KLEES, J., dissents with reasons.
KLEES, Judge, dissenting.
I respectfully dissent.
Considering Ms. Davis' testimony as a whole I would conclude that the trial court was clearly wrong to accept her statements as credible that she fell in Schwegmann. This assessment is based on the implausibility of an alleged fibroid brain tumor, diagnosed in 1986 or earlier and causing severe headaches and sensory difficulties, yet untreated at the time of trial in January 1992. During that time, according to Ms. Davis, she did not inform either her attorney or any of her physicians of the tumor's existence or of its effects; it became relevant only when she realized her testimony conflicted with her initial report to her treating physicians. At that time the trial court allowed the witness to "step down and talk to your lawyer, whisper in his ear and come back up and see what you know, you can talk to your lawyer and ask him whether you ought to say something or whatever". Further, there is nothing to indicate that her difficulty determining left from right or up from down impaired her *486 ability to testify at her deposition, but only at trial.
Additional inconsistencies in Ms. Davis' testimony support the fact that she lacked credibility. For example, it was shown that at her May 1987 deposition she admitted "clowning around" with her niece at the time of her accident, but at trial Ms. Davis testified that she and her niece went in separate directions shortly after entering the store. Even considering the passage of time, it would be expected that the presence or absence of a friend or relative would be a memorable circumstance of such an incident, not an insignificant detail that would fade.
The trial court found support for Ms. Davis' claim in the signed statement by Cecelia Milanes (D-7), which states "a customer... told me a lady down there fell on some water on the floor...." Consideration of this document was error, however, as the record shows that this statement was excluded as hearsay. In addition, the portion relied upon constitutes double hearsay, being Ms. Milanes' declaration of what an unnamed customer said.
Contradicting Ms. Davis' testimony was her prior statement that she slipped but did not fall, admissible as nonhearsay under C.E. art. 801(D)(2)(a). She denied that she said that, and didn't recall a form being completed for her to sign, but she admitted that her signature was on the Loss Notice (D-3). Michael Hughes testified that he recorded this statement just after the incident based upon what he was told by Ms. Davis. Although the trial court indicated Mr. Watson's testimony was suspect, nothing in the record suggests that Mr. Hughes' credibility was called into question. Further, Ms. Davis offered no explanation for the discrepancy between that statement and her subsequent reports and testimony.
Considering Ms. Davis' initial report that she did not fall, the inconsistencies in her statements, deposition and trial testimony and the implausible explanation of an untreated brain tumor, the trial court's determination that Ms. Davis had carried her initial burden of proving an accident occurred was clearly wrong. Accordingly, I would reverse.
NOTES
[1] Although this statute was amended by 1990 Acts No. 1025, the amendment does not apply to this case since the cause of action arose prior to the September 1, 1990 effective date.