687 So.2d 1087 (1997)
John MALDONADO
v.
LOUISIANA SUPERDOME COMMISSION, Louisiana Stadium and Exposition Directors, Facility Management, Inc., and Facility Management of Louisiana, Inc.
No. 95-CA-2490.
Court of Appeal of Louisiana, Fourth Circuit.
January 22, 1997.
Writ Denied April 18, 1997.
*1089 J. Nelson Mayer, III, Valteau, Harris, Koenig & Mayer, New Orleans, for Plaintiff/Appellee, John Maldonado.
Richard P. Ieyoub, Attorney General, Lionel J. Favret, III, Assistant Attorney General, M. Chad Pellerin, Assistant Attorney General, New Orleans, for defendant/appellant, State of Louisiana through Louisiana Stadium and Exposition District and Facility Management of Louisiana, Inc.
Before BARRY, KLEES and MURRAY, JJ.
MURRAY, Judge.
The State of Louisiana, through the Louisiana Stadium and Exposition District and Facility Management of Louisiana, Inc. (Superdome), appeals a judgment awarding John Maldonado $294,159.24 in damages, including $29,452 in future lost wages, in connection with injuries sustained when he fell while entering the Superdome for a Saints pre-season game. We affirm.

FACTS
On August 12, 1989, at around 7:30 p.m., forty-three-year-old John Maldonado left the Hyatt Hotel where he worked as a cook and walked through the New Orleans Centre toward Gate C of the Superdome to attend that evening's Saints game. The weather was clear and dry, and it was beginning to get dark as he approached the series of doors into the Dome shortly before 8:00 p.m. When Mr. Maldonado was approximately three steps from the doorway, he slipped and fell, landing on his buttocks and then his left elbow as he attempted to break his fall. He immediately experienced pain in his back, neck and left arm. While on the ground, Mr. Maldonado noticed for the first time that a large area around the doorway was wet and, judging by the smell, decided he had slipped in an accumulation of spilled beer.
Mr. Maldonado got up and told the ticket-taker at one of the turnstiles just inside the doors that he had fallen. This Dome employee, *1090 later identified as Robert Jones, directed Mr. Maldonado to the first aid office. On his way to that location, Mr. Maldonado ran into a family friend, Frances Eckart, who asked why his white pants were all wet and dirty. The two spoke briefly as he told her what had happened, then Mr. Maldonado found a security guard who escorted him to first aid. A nurse there checked his vital signs and completed a report, after which he and the guard returned to the scene of his fall. By this time, thirty minutes or more after he had fallen, the area in front of and around the doors was being cleaned up by three or four Superdome employees. Mr. Maldonado called his wife to drive him home, and left without watching the game.
Mr. Maldonado saw his family physician, Dr. Dan W. Joachim, five days after the accident. Dr. Joachim, an internist, noted swelling and redness over the sacral area and diagnosed an acute lower back strain. Mr. Maldonado was advised not to return to work for the time being, and was given medication and therapeutic exercises to perform. Dr. Joachim noted continuing symptoms in later visits on August 24 and September 14, and on the latter date approved Mr. Maldonado's suggestion of chiropractic treatment. On October 20, 1989, Mr. Maldonado reported that the chiropractor seemed to be helping, but Dr. Joachim did not feel he was ready to return to work. However, after the next examination on November 17, 1989, Dr. Joachim told Mr. Maldonado he could return to work, but instructed him to avoid heavy lifting and to continue his therapy with the chiropractor.[1] Dr. Joachim testified that although Mr. Maldonado sought subsequent treatment for his back elsewhere, the injury was discussed at the patient's continuing visits for hypertension and anxiety up to the date of trial.
Mr. Maldonado received regular chiropractic treatments through September 24, 1990, but found that his performance at work was impaired because he could not stand for long periods of time, bend or pick up heavy objects without experiencing pain. On November 12, 1990, Mr. Maldonado consulted Dr. Norman Ott, III, another internist, reporting worsening pain radiating down both legs, but especially the left leg. Dr. Ott's examination was generally negative, so he asked Mr. Maldonado to see an orthopedist and have an MRI performed to permit a better diagnosis. Mr. Maldonado returned on November 30, 1990 and on May 10, 1991 with the same complaints and reporting increased absences from work, but he had not had the additional testing performed. Since Dr. Ott could offer no treatment without further data, he discharged Mr. Maldonado with instructions to see an orthopedist.
Mr. Maldonado then consulted Dr. Wilmot Ploger, an orthopedist, on June 5, 1991, with the same complaints as reported to Dr. Ott. After obtaining a history of prior treatment, Dr. Ploger's examination indicated a left nerve root irritation, leading him to suspect a ruptured or herniated lumbar disc. This diagnosis was confirmed by an MRI, which revealed a ruptured disc at L5-S1. Although Mr. Maldonado initially rejected Dr. Ploger's recommendation of surgery, increasing pain and weakness in the left leg forced him to stop work in September 1991, and a lumbar laminectomy was performed October 29, 1991.
Dr. Ploger described Mr. Maldonado's post-operative progress as "slow but steady" until April 1992, when he reported that his left leg had given way a week earlier. In July 1992, after reviewing an MRI that showed no new herniation, Dr. Ploger released Mr. Maldonado to return to light-duty work. When he returned for a check-up in November, Mr. Maldonado reported that he had tried to do catering work,[2] but had to stop due to pain. He had begun using a back brace, which helped relieve his symptoms.
By July 1993, Mr. Maldonado's pain had returned to pre-operative levels, requiring two pain pills a day and the use of a cane for walking. A year later, reports of increasing *1091 numbness and weakness in the legs led Dr. Ploger to request another MRI, which revealed a new bulging protrusion of the L5-S1 disc. Dr. Ploger testified that, more probably than not, this recurrent herniation was caused by the natural process from the surgery; such recurrence does not require new trauma.
Dr. Ploger last saw Mr. Maldonado in December 1994, five months before trial. He estimated that Mr. Maldonado had a 5 to 10 percent permanent physical impairment of the spine, and that it is more probable than not that this was caused by the fall at the Superdome. Based upon objective findings as well as Mr. Maldonado's reports of pain, Dr. Ploger believes any work activity should be restricted: no repetitive stooping, bending or lifting; occasional lifting limited to twenty-five pounds; standing as per tolerance. Other than his 1992 attempt as a caterer, however, Mr. Maldonado has not worked since September 1991.
After a bench trial, the district court entered judgment in favor of Mr. Maldonado. In written reasons, the court found "that the defendants had constructive if not actual notice through the presence of the ticket taker at the turnstile where the incident occurred," and awarded $175,000 in general damages and $119,159.24 in special damages. This appeal followed.
The Superdome assigns four errors by the trial court: (1) the trial court erred in finding the Superdome acted unreasonably in its duty to protect plaintiff; (2) the trial court erred in not apportioning fault to the plaintiff; (3) the trial court erred in finding that the plaintiff satisfied his burden of proving causation of a herniated disc; and (4) the trial court erred in awarding $29,452 in future lost wages to plaintiff.

STANDARD OF REVIEW
Citing Hayes v. Commercial Union Assurance Co., 459 So.2d 1245 (La.App. 1st Cir. 1984), writ denied, 462 So.2d 1247 (La.1985), and Brousseau v. Tucker, 479 So.2d 446 (La. App. 1st Cir.1985), writ not considered, 481 So.2d 1329 (La.1986), the Superdome contends that the standard of review to be applied here is "a sufficiency and preponderance of the evidence, not manifest error," at least as to those issues for which the trial court relied upon deposition testimony. Mr. Maldonado asserts that all factual findings, whether based upon live witnesses or not, are subject to the manifest error/clearly wrong standard of appellate review.
The Superdome's reliance on Hayes and Brousseau is misplaced. The cited jurisprudence was overruled by Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). See Alexander v. Pellerin Marble & Granite, 93-1698, p. 4-5 (La.1/14/94), 630 So.2d 706, 709-10; Brooks v. Leggett & Platt, Inc., 94-0617, p. 6 (La. App. 1st Cir. 11/9/95), 665 So.2d 432, 436. Therefore, the manifest error/clearly wrong standard applies, and this Court cannot reverse the judgment below unless we find that "a reversible error of law or manifest error of material fact was made in the trial court." Ferrell v. Fireman's Fund Ins. Co., 94-1252, p. 4 (La.2/20/95), 650 So.2d 742, 745.

CONSTRUCTIVE NOTICE
In its first assignment of error, the Superdome asserts that the trial court erred in finding the Superdome breached its duty to Mr. Maldonado. The defendant contends Mr. Maldonado failed to prove that the Superdome had actual or constructive notice of any spillage where he allegedly fell, and that there was no evidence that it had a reasonable opportunity to correct the alleged hazardous condition.
In order to maintain a claim for damages caused by the condition of things within the care and custody of a public entity, the complainant has the burden of proving that the public body had actual or constructive notice of the hazard and had a reasonable opportunity to remedy the condition, but failed to do so. La.Rev.Stat. Ann. § 9:2800(B); Purolator Courier Corp. v. City of New Orleans, 93-1068, p. 2 (La.App. 4th Cir. 3/29/94), 635 So.2d 1232, 1233, writs denied, 94-1509, 94-1542 (La.9/23/94), 642 So.2d 1296-97; Rubino v. La. Stadium & Exposition District, 619 So.2d 738, 740 (La. App. 4th Cir.1993). Thus, "the distinction between public bodies' negligence and strict *1092 liability" has been eliminated by statute. Rhodes v. State, DOTD, 95-1848, p. 7 (La.5/21/96), 674 So.2d 239, 242.
Constructive notice is defined as "the existence of facts which infer actual knowledge." La.Rev.Stat. Ann. § 9:2800(C). Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. LeBlanc v. City of New Orleans, 573 So.2d 1274, 1276 (La.App. 4th Cir.), writ denied, 575 So.2d 826 (La.1991); see also Bustamente v. The City of New Orleans, 175 So.2d 404 (La.App. 4th Cir.), writ denied sub nom. Escardille v. City of New Orleans, 248 La. 362, 178 So.2d 655 (1965).
In this case, Frances Eckart testified that when she entered the Dome at Gate C shortly before the 7:00 p.m. kick-off, she recalled seeing a wet area around a doorway and the adjacent turnstiles. However, she could not remember which set of doorways she used, nor could she describe the size or depth of the wetness.
Robert Jones, the ticket-taker, testified that Mr. Maldonado's pants were visibly wet when he approached to report the accident, which was described as occurring just outside a nearby door. While Mr. Maldonado testified that he fell in clear view of the ticket-taker and several other employees standing at the turnstiles, Mr. Jones said he did not see the fall because he was busy. He also testified that he did not remember looking to see if there was a spill or other hazard at the time Mr. Maldonado approached him, but the security guard's report on the incident shows that at approximately 8:40 p.m. there was no evidence of a spill.
Desiree Jones, the Superdome's housekeeping manager, testified that all ticket-takers, as well as ushers and their supervisors, are responsible for notifying housekeeping by radio if a spill is seen so it may be cleaned up promptly. Because the turnstiles are adjacent to the doors, ticket-takers are expected to report hazards outside the doors as well as inside, and they are authorized to close the doors if necessary to prevent patrons from walking through a wet area. There is also one janitor stationed in the area of Gate C and the smaller Gate D to the left, and supervisors patrol both inside and outside the Dome to detect conditions that require a clean-up.
Ms. Jones also testified that it was Superdome policy to require patrons to throw away any outside drinks or containers before entering the building. Because of this rule, cups and other trash are frequently just dropped to the ground by the doors rather than being thrown in any of the numerous cans at each gate. Because of its link to the Hyatt, Gate C experiences the heaviest traffic; evidence showed that on this date, 21,594 of the 57,683 people entering used the turnstiles at Gate C. Ms. Jones stated that cleaning up around the doors generally cannot begin until an hour after the kick-off due to a continuous stream of latecomers.
Mr. Maldonado testified that he fell in a large wet area that appeared to be an accumulation of spilled beer. He also recalled that the trash cans outside the doors at Gate C were overflowing, but there were no cleaning people in the area. Both Mr. Maldonado and Robert Jones stated that the number of people entering the Dome had decreased at the time of this incident, which the security guard estimated occurred at 7:55 p.m.
This evidence amply supports the trial court's conclusion that the Superdome had constructive notice of the spillage that caused Mr. Maldonado to fall, as well as an opportunity to correct the condition. Despite awareness of the patrons' tendency to simply dump cups and trash at the doorways, Ms. Jones acknowledged that clean-up efforts are frequently delayed until the number of people entering decreases, which could be an hour after the kick-off. Additionally, although all employees are supposed to look for and report potential hazards, it is apparent that in this case no one inspected the area at issue, even after Mr. Maldonado, visibly wet and shaken, pointed out the location where he had fallen to Mr. Jones and other employees at the turnstiles. Mr. Maldonado's testimony concerning the location and size of the wet *1093 area at the time of his arrival was unrefuted, and is suggestive of a condition that had existed for a substantial period of time.
The trial court is vested with much discretion in assessing the credibility of witnesses and making factual inferences from the evidence presented. Davis v. Schwegmann Giant Super Markets, 92-2051, p. 10 (La.App. 4th Cir. 1/13/94), 631 So.2d 479, 484. The conclusion that the Superdome had constructive notice of the condition was a factual finding. An appellate court cannot reverse a trial court's decision based on factual findings and reasonable evaluations of credibility unless those conclusions are clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La.1993); see also Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no error in the trial court's conclusion that the Superdome had constructive notice of the spill which caused Mr. Maldonado's slip and fall.

COMPARATIVE FAULT
In its second assignment of error, the Superdome asserts that the trial court's failure to find that Mr. Maldonado's own negligence contributed to his injuries was manifestly erroneous.
The factors to be used to compare degrees of fault were set forth in Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985): (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required the actor to proceed without proper thought, and (6) the relationship between the actor's conduct and the harm to the plaintiff. The determination of whether comparative fault applies in a particular case is essentially a factual one and subject to the manifest error standard on appellate review. Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610-11. Only if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages. Id. at pp. 7-8, 666 So.2d at 611.
Applying these principles to the evidence presented here, we cannot find manifest error in the trial court's determination that Mr. Maldonado was not at fault in causing his injuries. Mr. Maldonado testified that he did not see the wet area as he approached the doors because he was looking straight ahead, at the ticket-taker. Because he had only been to the Dome once or twice before, Mr. Maldonado was not aware that drinks were often dropped to the ground as people entered the doors. There were no witnesses to the accident, and thus no other evidence to suggest that Mr. Maldonado was not exercising reasonable care at the time he fell. In contrast, Ms. Jones' testimony established that the Dome was aware that patrons often threw cups to the ground at the doorways, and that this practice substantially increased the risk that someone might fall. The Superdome was in a superior position to discover the hazard and either place warnings or clean the area in order to avoid injuries to patrons. Furthermore, the failure of those responsible for detecting and cleaning up the spill was found to be the direct cause of plaintiff's injuries. After considering the Watson factors in light of the evidence presented, we cannot say that the fact-finder erred in assigning 100% fault to the Superdome. See, e.g., Matthews v. Ferrer, 95-0266, pp. 5-8 (La.App. 4th Cir. 11/30/95), 665 So.2d 1211, 1214-15.

CAUSATION
The Superdome asserts, in its third assignment of error, that the trial court erred in concluding that Mr. Maldonado's herniated disc was caused by his slip and fall at the Superdome, rather than by another accident.
In a personal injury action, the plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue. Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 3 (La.2/20/95), 650 So.2d 757, 759. If the medical testimony establishes that it is more probable than not that subsequent injuries were caused by the trauma suffered in the incident, the burden of proof is satisfied. Id. A presumption of causation will aid a plaintiff in meeting this burden, *1094 if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Housley v. Cerise, 579 So.2d 973, 980 (La. 1991); see also Juneau v. Strawmyer, 94-0903, pp. 4-6 (La.App. 4th Cir. 12/15/94), 647 So.2d 1294, 1298-99. To rebut this presumption, "defendant must show some other particular incident could have caused the injury in question." Maranto, 94-2603, p. 6, 650 So.2d at 761. This issue is a factual one, reviewed by an appellate court under the manifest error standard. Id. at p. 7, 650 So.2d at 761.
The Superdome contends that Mr. Maldonado failed to inform his treating physicians of other accidents that may have caused his herniated disc, thus discrediting the opinions as to causation. Because both Dr. Joachim and Dr. Ploger testified that additional information concerning prior or subsequent trauma could change their conclusions, it is argued that no evidence supports the finding of a causal connection between this accident and the claimed injury. Instead, the defendant attributes Mr. Maldonado's herniated disc to three different accidents, allegedly occurring in March 1989, July 1990 and December 1990.[3] However, our review of the record reveals no credible evidence suggesting that Mr. Maldonado suffered any injury to his back other than in the accident at issue here.
The Superdome contends that Mr. Maldonado's employment records from the Hyatt establish that he injured his back in an accident in March 1989, apparently relying upon a lawyer's pre-printed, fill-in-the-blank questionnaire to the Hyatt about absences for "injuries received in an automobile accident 3-14-89," with the date written in by hand. However, Mr. Maldonado's testimony indicates that the attorney sending the form represented him in connection with a 1989 claim against a restaurant chain, arising when a door had slammed into his face. Because neither Mr. Maldonado nor his wife recalled any automobile accident in early 1989, it is reasonable to infer that the law firm merely used a standard questionnaire but failed to change the pre-printed wording from "injuries received in an automobile accident" to show instead that the claim concerned "injuries received when a door slammed into his face." Furthermore, this document indicates that Mr. Maldonado told the Hyatt his absences were due to dizziness and headaches, with no mention of a back injury or related symptoms. Thus, no preceding cause of Mr. Maldonado's herniated disc is suggested.
Mr. Maldonado was also cross-examined at trial about an automobile accident on July 4, 1990, and was asked to review a document presented by the defense attorney which related to that incident. Despite review of that record, Mr. Maldonado said he did not recall any car accident on that date. The document was not admitted into evidence, and nothing in the Hyatt's employment file reflects either an absence or a report of injury at any time in July 1990. Therefore, the Superdome failed to establish that such a subsequent accident occurred at the time alleged.
The only incident shown to have occurred after Mr. Maldonado's fall at the Superdome is reflected on a disciplinary report by the Hyatt, indicating the plaintiff did not report to work as scheduled on December 26, 1990. In the "Employee Comments" section of the form, Mr. Maldonado explained his absence: "A vehicle ran a red light. I put on brakes and went forward, hurting my ribs." However, this report does not establish that any collision occurred, nor was any evidence presented to suggest that the symptoms of Mr. Maldonado's pre-existing back injury suddenly *1095 changed or intensified after this incident.[4] This employment record thus fails to support the Superdome's allegation of a subsequent cause of plaintiff's herniated disc.
Thus, although both Dr. Joachim and Dr. Ploger testified that a history of prior or subsequent back injuries could affect their opinions concerning the cause of Mr. Maldonado's herniated disc, no such injuries were proven. Furthermore, neither doctor was given any additional information about the accidents or injuries alleged to have occurred, even though Dr. Ploger specified that he would need further details in order to consider an alternative cause. The Superdome's argument on this issue is therefore entirely speculative, based merely on the experts' testimony that different facts could result in a different conclusion.
In this case, both Mr. Maldonado and his wife testified that he had no problems with his back prior to his slip and fall at the Superdome. Dr. Joachim's medical records, dating back to August 9, 1984, show no complaints of back pain or injury of any kind prior to August 17, 1989. Similarly, Mr. Maldonado's employment records from the Hyatt reflect that he was able to adequately perform the duties of his job prior to this incident, but subsequently had increasing problems and more frequent absences. This evidence thus establishes that the plaintiff was in good health prior to the Superdome incident, but that his condition slowly deteriorated and eventually resulted in an inability to perform his job duties and a decreased ability to care for himself. Dr. Ploger's expert opinion, unchanged on cross-examination, was that Mr. Maldonado's fall on August 12, 1989, caused the subsequent herniated disc, which in turn led to a recurrent herniation discovered in July 1994.
With this evidence, Mr. Maldonado satisfied his burden of proving that his back injury and subsequent problems were more likely than not caused by the slip and fall at the Superdome. The defendant failed to rebut this evidence of causation, either by showing some other particular accident could have caused the injury or by a meaningful challenge to the expert medical opinions. Therefore, the trial court did not err in finding a causal connection between the accident at issue and the damages claimed.

FUTURE LOST EARNINGS
In its last assignment of error, the Superdome argues that the trial court erred in awarding Mr. Maldonado $29,452 in future lost earnings because there was no medical evidence of a total disability. The defendant contends that the figure awarded, which was based upon the testimony of Dr. Melville Wolfson, an expert economist, was predicated "on the assumption that Mr. Maldonado could do no further work because of this accident.
The defendant has misinterpreted the economist's testimony:
Plaintiff's counsel: And did you calculate what his lost wages would be ... through the end of what would be his normal worklife expectancy?
Dr. Wolfson: Yes. Calculation shows that if he couldn't do anything, present value would be $122,172....
* * * * * *
The Court: What is the calculation number three, the credit for $8,840 and then you get the figure of 29,452, what does that refer to?
Plaintiff's counsel: I was going to get to that.
Dr. Wolfson: What number is that, number three? If he can make a minimum wage today, then the difference between full-time minimum wage of $8,800, [and] at $5.60 an hour, $11,648, the difference would be $29,452 if he could make minimum wage from today's date forward.
The Court: That's the present value?
Dr. Wolfson: Present value.
This testimony makes clear that the trial court's award was not for a total disability, but was predicated on the assumption that Mr. Maldonado's physical restrictions would allow him to earn minimum wage, which was *1096 less than his hourly rate at the Hyatt of $5.60 per hour. This assignment of error is thus without merit.

CONCLUSION
For the reasons assigned, we find no error in the trial court's determination that the Superdome had both constructive notice of, and a reasonable opportunity to correct, the hazard which caused Mr. Maldonado's fall. Similarly, the evidence and resulting inferences support the conclusion that no comparative fault should be assigned to the plaintiff, who exercised reasonable care for his own safety under the circumstances. Because the defendant failed to rebut Mr. Maldonado's evidence of causation, the trial court properly awarded damages for those losses demonstrated at trial. The judgment below is therefore affirmed, with defendant bearing the costs of this appeal.
AFFIRMED.
NOTES
[1] Although subpoenaed, the chiropractor, Mark T. Schwaiger, D.C., did not appear to testify at trial.
[2] Mr. Maldonado's personnel records from the Hyatt show that because he was unable to return to work after a six-month medical leave of absence, the maximum permitted, he was "voluntarily" terminated in April 1992.
[3] In its appellate brief, p. 14, the Superdome also refers to "an accident on June 18, 1990" which was associated with Mr. Maldonado's employment report "on June 14, 1990, ... that `his back was giving (him) extreme pain.'" However, neither the transcript nor the evidence submitted at trial suggests such an accident was alleged in the court below.
[4] Mr. Maldonado had first reported radiating pains in his legs to Dr. Ott on November 12 and November 30, 1990; his next visit was not until May 10, 1991, well after the alleged "accident" of December 26, 1990.