ROLAND L. BELSOME, Judge.
1 Appellant Gerald Post appeals the district court’s judgment finding that the state did not negligently perform Mr. Post’s laparoscopic inguinal hernia repair.
*50 STATEMENT OF THE CASE
Gerald Post (“Mr.Post”) was a 52-year old male who underwent laparoscopic left inguinal hernia repair with placement of Marlex mesh at the Medical Center of Louisiana at New Orleans on February 13, 1997. During the course of the operative procedure a piece of Marlex mesh, approximately 4 by 2 cm. in length was placed and the laparoscopic reticulating stapler was used to secure the mesh in place medially at the pubis and Cooper’s ligament working laterally. The mesh was draped over an area sometimes referred to as “the triangle of doom,” which is traversed by the iliac artery, iliac vein and vas deferens.
Subsequent to the surgery Mr. Post developed thrombus, or DVT (deep venous thrombosis), in his left lower extremity. After treatment with blood thinners, the resident physician who performed the la-paroscopic procedure, Dr. Tim Erhlich, suggested that the Marlex mesh may be impinging the iliac veiii and that the mesh should be removed. Consequently, two weeks after the laparoscopic procedure, Dr. James Redmann performed an open hernia repair and removed the |?mesh. Mr. Post was continued on blood thinning medication which improved the blood flow in his left leg, though he still suffered from a thrombotic condition at the time of his discharge. Mr. Post convened a medical review panel against the State of Louisiana through the Department of Health and Hospital, Medical Center of Louisiana at New Orleans. In his complaint, Mr. Post argued that the laparoscopic hernia repair must have breached the standard of care since he developed DVT after the surgery. The panel found no breach of the standard of care and Mr. Post subsequently sued.
The trial court dismissed plaintiffs case with prejudice. In its reasons for judgment, the trial court noted that the plaintiff did not meet his burden of proof. Specifically, the court rejected the testimony of plaintiffs expert, Dr. Balliro, because,
it was obvious that Dr. Balliro had never even performed one of these procedures. The (trial) court accepts the testimony of the three surgeons who performed laparoscopic hernia repair. They testified that if the mesh caused compression of the iliac vein, the thrombus would have occurred at the compression site.
Essentially, witnesses from each side argued different explanations for the injury (Appellant’s witness testified that the ill-placed mesh caused the injury; Appellee’s witnesses testified that the mesh was not ill-placed, and that the injury was a normal by-product of the surgery), and the trial court found the defendant’s argument more credible. Plaintiff now appeals this ruling.
Mr. Post asserts three assignments of error. First, the trial court committed manifest error when it concluded that the mesh had not caused the thrombus. Second, the court below erred as a matter of law by not applying an adverse inference based upon the unexplained failure of the defense to call Dr. Ehrlich, the surgeon who implanted the mesh. Finally, the trial court erred in basing its opinion |son the mistaken assumption that Mr. Post’s expert had not performed laparoscopic inguinal hernia repairs.
STANDARD OF REVIEW
A party seeking reversal of a fact finder’s determinations in a medical malpractice action faces a heavy burden. At trial, the plaintiff must prove the standard of care, the violation or breach of the standard of care, and the causal connection between the alleged negligence and injuries. Carey v. Rao, 2001-1235, p. 10 (La.App. 4 Cir. 9/11/02); 828 So.2d 53, 60. It is understood that in a medical malpractice action, great deference is accorded to the *51 finder of fact when medical experts express differing views, judgments and opinions as to whether the standard of care was met. See Carey v. Rao, at pp. 10-11; at 60-61. “Reversal of the fact finder’s determinations requires the appellate court to conclude that no reasonable factual basis exists for the fact finder’s findings and to determine that the record establishes that such findings are clearly wrong or manifestly erroneous.” Stobart v. State, through Department of Transportation and Development, 617 So.2d 880 (La.1993). Thus, a factfinder’s findings of facts should not be disturbed absent manifest error or unless they are clearly wrong. See Martinez v. Schumpert Medical Center, 27,000 (La.App. 2 Cir. 5/10/95); 655 So.2d 649. With this burden in mind, we turn to the appellant’s assignments of error.
First Assignment of Error
Plaintiff-appellant alleges that the trial court committed manifest error when it concluded that the mesh had not caused the thrombus. We disagree. Both sides | ¿produced evidence addressing the standard of care, breach, and causation, and the trial court found that the plaintiff did not meet his burden.
As we stated in Williamson v. Haynes Best Western of Alexandria,
[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said ... [Where] a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Williamson, 95-1725 (La.App. 4 Cir. 1/29/97); 688 So.2d 1201, 1205 (emphasis added and internal citations omitted); See Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
This court addressed the deference given by an appellate court to a trial court’s determinations in Schiro v. State ex rel. Dept. of Transp. and Development, 1999-2754 (La.App. 4 Cir. 3/21/01); 808 So.2d 500, 508.
The weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. Quinones v. United States Fidelity and Guaranty Company, 93-1648 (La.1/14/94), 630 So.2d 1303, 1308. The sincerity and honesty of the opinions expressed are matters which the trial court is in a particularly advantageous position to determine. Id. Where the testimony of expert witnesses differ, the trier of fact has the responsibility to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1111 (La.1990). Credibility determinations are subject to the strictest deference, and the manifest error standard demands great deference to the trier of fact’s findings. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1313. Schiro at 508.
To meet his burden of proof, the plaintiff presented Dr. James Balliro. Dr. Balliro was tendered as an expert in the field of general surgery with laparoscopic and vascular surgery specialties. The tender was accepted, but the record reflected that the plaintiffs expert had never performed one of these surgeries, and, as the |sdefense points out, the issue in this case is whether there was a breach of the standard of care in the performance of the laparoscopic inguinal hernia repair.
*52 The defense presented three doctors as witnesses: Glen Steeb, Ed Staudinger, and James Redmann. Collectively, the three surgeons perform many laparoscopic inguinal hernia repairs annually. Despite limited personal experience with this procedure, Dr. Balliro testified:
The prosthetic mesh that was placed to occlude his hernia defect compressed the external iliac vein, which is a large vein that drains the blood out of your leg. As a result of the compression, the vein clotted off and Mr. Post suffered irreversible injury to the venus drainage from his leg.
This testimony was based on three “facts.” First, the thrombus occurred in the same venal system that the mesh allegedly constricted. Second, the CT scan demonstrated “inflammatory” changes around the vein. Finally, Dr. Redmann, who performed the second surgery, made the diagnosis before surgery and then had to remove the mesh to relieve the compression of the vein. These three factors led Dr. Balliro to conclude that the ill-placed mesh caused the DVT, but all these were also addressed and refuted by defendant’s witnesses.

Significance of the Mesh and Thrombus being in the Same Venal System

The defense witnesses testified that surgically speaking, the distance between the alleged compression of the iliac vein and the location of the thrombus in the femoral vein was very large, and the fact that these two events (the mesh compressing the iliac vein and the development of the DVT in the femoral vein) occurred in the same venal system was inconclusive.
Dr. Staudinger offered the following testimony about the location of the thrombus:
lidiad there been a compression, obstruction of the iliac vein, I would think that is where the thrombus would have started. Usually thrombus will develop at the point of obstruction and not downstream ... So, if there had been an obstruction, a compression, blockage external blockage of the external iliac or the iliac vein, the thrombus should have been seen at that point and propagated the other way, whereas in this case, the thrombus was seen in the common femoral and the superficial femoral veins, which is a significant difference — distance from the iliac vein.
In light of this competing testimony, we cannot say it was manifestly erroneous to find that the DVT in the femoral vein and the possible compression of the iliac vein by the mesh were causally unrelated.

The Conclusiveness of the CT scan

Dr. Balliro also testified that the CT scan is probative of iliac compression which caused plaintiffs DVT. In his brief, appellant argues that “a CT scan with contrast demonstrated a clot in the common femoral vein which is the same blood vessel as the iliac vein.” But later, he writes “(b)ecause of a flaw in the performance of the CT, it did not fully visualize the iliac vein, but it did show opacification of the iliac vein, which is consistent with a blood clot.”
Thus, plaintiff admits that the CT did not fully visualize the iliac vein. Dr. Stau-dinger further testified that “there was no evidence of thrombus in the iliac vessel by the CT scan.” Dr. Steeb also testified that the CT scan did not support a finding that the mesh caused the DVT. The trial court believed that the CT was inconclusive as to whether the clot was formed at the point where the mesh allegedly compressed the iliac vein.
In sum, there was conflicting testimony on the CT scan and what it showed, and the trial court chose to believe the defendant’s testimony. This was not manifestly erroneous.
*53 | tRemoval of Mesh
It is a fact that Dr. Ehrlich, who performed the first surgery, speculated after-wards that the thrombus was being caused by the mesh constricting the ilial vein. It is also undisputed that during the second surgery, Dr. Redmann removed the mesh. Appellant contends that these facts prove that the ill-placed mesh caused the thrombus.
Appellees argue that Dr. Ehrlich’s speculation was just that — speculation. Dr. Redmann, who removed the mesh, was in the best position to determine if that speculation was correct, and he testified that the iliac vein was not being constricted when he examined it during the second surgery.
Appellees also argue that Dr. Redmann would have only removed the mesh if it were causing the thrombus. Dr. Redmann testified that he removed the mesh because he feared that re-attaching the mesh would increase the risk of infection. Again, there was conflicting, credible testimony from both sides on this issue. That the trial judge found Dr. Redmann’s testimony more convincing is not manifestly erroneous.

A Common Side Effect of Surgery

Additionally, defendant also put on evidence that DVT is a common side effect of any surgery. At trial, both plaintiffs and defendant’s witnesses testified that thrombus is a common side-effect of surgery, and that the iliac and femoral vessels are the most common site for DVT after surgery, irrespective of where the surgery was. This testimony supported the trial court’s determination the plaintiff did not meet his burden of proof.
Since the trial court determined that the plaintiff did not prove that the mesh caused the thrombus and that determination was not manifestly erroneous, we do |snot feel the need to address the issue of whether allowing the mesh to compress the iliac vein and cause a DVT breached the standard of care. •
Second Assignment of Error
Mr. Post contends that the court below erred in not applying the adverse inference rule to the defense’s presentation because they did not call one of the resident surgeons who performed the surgery. A party’s failure to call a witness it controls and which witness has material knowledge of material facts pertinent .to the case may allow the trial court to infer that testimony would have been adverse to the party. Taylor v. Entergy Corp., 2001-0805 (La.App. 4 Cir. 4/17/02); 816 So.2d 933. Appellant’s claim that the adverse inference rule applies to Dr. Ehrlich’s failure to appear at trial is not supported by the law or facts. Mr. .Post never- raised this issue at.trial, thus the trial court never had the opportunity to make a determination of its application in this case. Moreover, Mr. Post took no depositions in this case, thus his speculation as to Dr. Ehrlich’s testimony, is not based on concrete evidence.
Appellees also argue that Dr. Redmann, who testified, was present at both surgeries and performed the second, which was the critical surgery for determining whether the first surgery had breached the standard of care for performing an inguinal hernia operation. Plaintiffs expert stated that Dr. Redmann was in the best position to determine where the mesh was located.
Finally, Dr. Ehrlich completed his residency in 1997 and moved to Connecticut to establish a private practice such that the defendant had little control over that witness.
This court addressed the adverse inference rule in Taylor.
*54 |3The “uncalled witness” rule has been defined as an adverse presumption that arises when a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence and fails to call such witnesses. A party’s: failure to call 1 such witnesses gives rise to the presumption that the witnesses’ testimony would be unfavorable to him. Although the advent of modern, liberal discovery rules has been -recognized to limit this rule, it remains viable. Indeed, this court has recognized this rule applies when, as in this case, witnesses with peculiar knowledge 'of material facts pertinent to- the case are not called. Taylor, p. 15, at 94Í. (internal quotations and citations omitted).
‘However, the Taylor court limited the impact of the adverse inference rule by noting that “the court may consider this presumption as it would any other relevant evidence in the case.” Taylor, p. 15, at 941.' Becaúse the court may consider this presumption as it would any other rélevant evidence in this casé, we dó not find it was manifestly erroneous to rule for the defendants despite Dr. Ehrlich’s absence. Although Dr. Ehrlich performed the first surgery, Dr. Steeb was also present at the first surgery and testified at trial. If the trial court, believed that ultimately the most critical testimony to this issue came from Dr. Redmann, who performed the second surgery and removed the mesh, we cannot say this was manifest error.
Third Assignment of Error
In its reasons for judgment, the trial court found the testimony of Drs. Red-mann, Steeb, and Staudinger credible because they routinely perform laparoscopic inguinal hernia repairs, and she rejected the opinion of Dr. Balliro, because it “was obvious Dr. Balliro had never even performed one of these procedures.” Appellant contends that this statement by the trial court is “both patently inaccurate and irrelevant.”
However, appellant supports this charge by saying “Dr. Balliro has performed many hernia repairs.” This is not the same as performing many |inlaparoscopic inguinal hernia repairs. Thus, we disagree that the trial court’s statement was inaccurate or irrelevant.
Appellant continues, “... (Dr. Balliro) is fully trained and highly experienced in advanced laparoscopic procedures.” Again, this does not mean that Dr. Balliro was fully trained and highly experienced in la-paroscopic inguinal hernia repair, the procedure at issue in this case. The appellant goes on to say, “[m]ost important, in 1997 he took a course specifically in laparoscopic inguinal hernia repair. Surgeons receive their training in the operating room.” The blanket statement “surgeons receive their training in the operating room,” is not supported by any evidence in the record, and also says nothing about the exact training Dr. Balliro received in this particular procedure. Appellant wants us to make a connection between these' two statements and conclude that Dr. Balliro must have performed laparoscopic inguinal hernia repairs in his training. We are not prepared to make that extenuated logical leap..
Later in his brief, Appellant concedes that Dr. Balliro does not even perform this procedure in his own practice.
The trial court found that Dr. Balliro’s iriéxperience and unfamiliarity with laparo-scopic inguinal hernia repair discredited his testimony. At trial, Dr. Balliro testified that he was unfamiliar with the expression “triangle of doom,” which is common parlance in most medical textbooks and literature about laparoscopic inguinal hernia repairs. Additionally, he testified that the Marlex -mesh was a “stiffj plastic *55 material,” while Dr. Redmann, who actually performs these procedures, testified that the mesh is very soft and pliable and is wrapped around a thin, pencil like-instrument, passed through the trochar and then unfolded over the hernia.
In Perhaps this court would have ruled differently on the issue; however, we cannot say that the trial court’s decision to not lend credibility to plaintiffs expert who had never performed one of the procedures at issue in the case was manifestly erroneous.
CONCLUSION
The standard of review is very important in this case. An appellate court cannot disturb a trial court’s determinations unless they are manifestly erroneous or there was clear error. Where the testimony of expert witnesses differ, the trier of fact has the responsibility to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1111 (La.1990).
In the case at hand, the trial court determined that the testimony of the plaintiffs expert witness was less believable than the testimony of the defense’s witnesses. Dispositive for the trial court was the fact that plaintiffs expert had never actually performed the surgery in question. We cannot say that its determination was manifestly erroneous or clear error, thus we affirm the judgment.
For the reasons listed above, we affirm.
AFFIRMED.