816 So.2d 933 (2002)
Sheri L. TAYLOR, Individually and as the Natural Tutrix of Her Minor Child, Kendra Taylor
v.
ENTERGY CORPORATION and/or Entergy Louisiana, Inc.
No. 2001-CA-0805.
Court of Appeal of Louisiana, Fourth Circuit.
April 17, 2002.
*934 Ford T. Hardy, Jr., New Orleans, LA, for Plaintiff/Appellee.
Kenneth P. Carter, Marcus V. Brown, Sandra Diggs-Miller, Entergy Services, Inc., New Orleans, LA, for Defendant/Appellant.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY.
MURRAY, Judge.
This personal injury suit arises out of a fall by plaintiff, Sheri Taylor, into a hole in the sidewalk allegedly created by defendants, Entergy Louisiana, Inc. and Entergy Corporation (collectively "ELI"). From the trial court's judgment in Ms. Taylor's favor against ELI in the amount of $25,000, both sides appeal. We affirm.

FACTUAL BACKGROUND
On Easter Sunday, April 12, 1998, at about 7:30 p.m., Ms. Taylor and her three-year old daughter were walking toward their home located at 1865 North Galvez Street, New Orleans, Louisiana. At that *935 time, it was getting dark,[1] and it was dry. As Ms. Taylor approached her house, she let go of her three-year old daughter's hand to get her keys out of her purse. When she did, her daughter ran ahead and fell into a hole. While attempting to retrieve her daughter, Ms. Taylor, who was a few months pregnant, lost her balance and also fell into the hole, injuring her left knee and leg and her back. Shortly thereafter, both Ms. Taylor and her daughter sought medical treatment for their injuries arising from their falling into the hole.[2]
On April 5, 1999, Ms. Taylor, individually and as the natural tutrix of her minor child, filed this suit against ELI asserting liability under both a negligence and strict liability theory. The petition alleges that Ms. Taylor and her child both fell into the "dangerous, defective, unmarked and uncovered work site hole" that ELI personnel created and that Ms. Taylor and her child could not see such hole "due to darkness and due to it negligently not being properly marked and/or barricaded and/or covered." The petition further alleges that their accident and resulting damages were caused by ELI's negligence in, among other things, failing to maintain its work area, and failing to cover or mark the hole. The petition still further alleges strict liability on ELI's part given its custody and control, i.e., garde, of the dangerous, unmarked and uncovered hole, its duty to mark and cover such hole, and its "actual and/or constructive notice of the dangerous and defective conditions of said work site area."
Answering, ELI admitted that on the date in question it was performing work on Galvez Street, and it had opened a hole in that street; however, ELI alleged that the hole was adequately covered, barricaded and was thus not unsafe. Otherwise, ELI denied plaintiffs' allegations.
A bench trial was held at which four witnesses testified live and two testified by deposition.
First, Ms. Taylor testified that although ELI had been performing work in the area for some time, she was unaware of the existence of a hole in the sidewalk in front of the double where she lived until after her daughter fell into it. She testified that she spent the week before the accident at her cousin's house in Slidell. Before coming home from her cousin's house, she stopped that Easter Sunday to visit her mother, who lived a block away from her. Around 7:30 p.m., she and her daughter left her mother's house to get some pictures from her home to show her mother. As noted, the accident occurred on the sidewalk in front of Ms. Taylor's home.
Ms. Taylor further testified that she lived in a double, which she shared with Keith Stovall and that the hole was located on Mr. Stovall's side of the double. Mr. Stovall took photographs of the work site area shortly after the accident, which were introduced into evidence. Those photographs depict an excavated area of the sidewalk that is covered almost entirely by plywood. To the extent the excavated area is uncovered, the photographs depict it as filled with sand and gravel, yet not entirely level with the sidewalk. The photographs *936 also show a barricade, but do not show any yellow tape.
When questioned about the photographs, Ms. Taylor replied that they did not accurately depict the area as it existed at the time of the accident. She testified that the hole in which she fell was between three and five feet deep and that the hole apparently was located underneath the plywood depicted in the photographs. She acknowledged that she could not explain how the hole became covered between the time she fell and the time the photographs were taken.
Ms. Taylor's story that she fell in a hole several feet deep was supported by the deposition testimony of Willie E. Rice, another neighbor. Mr. Rice testified that he has known Ms. Taylor since she was a little girl. Mr. Rice testified that at about 7:45 p.m. on the day of the accident, he went out to walk his two dogs and saw about a dozen people hovering around a "manhole." He asked someone what had happened and was told that "a baby fell in there." He further testified that Ms. Taylor was standing in the hole helping her child out of the hole. Because he believed that Ms. Taylor had enough help and because "a lot of people are scared of dogs," Mr. Rice departed the accident scene and continued walking his dogs.
Although Mr. Rice acknowledged that he did not see either Ms. Taylor or her daughter actually fall into the hole, he estimated the depth of the manhole to be "waist deep or maybe a little bit deeper" and described the width of it as not "too big." Mr. Rice testified that he was familiar with the size of manholes because he "used to do manholes a long time ago [him]self." When asked whether it was about the size of a "regular manhole," Mr. Rice replied that it was "a narrow hole open there that she was in.... [T]hey were sitting around a hole with a lot of sand and stuff around there." Upon further questioning, Mr. Rice estimated that the hole was "[m]aybe three feet by whatever."
Mr. Rice still further testified that he had observed the holes left uncovered at times during the lengthy period (eight to nine months) that ELI worked in the neighborhood. Particularly, he testified that "[s]ometimes at night they would be closed and sometimes they wouldn't. Maybe like they left in a hurry or rain would run them of or something, you know." Mr. Rice still further testified that he did not know who uncovered the holes; particularly, he stated: "kids passing out there in that neighborhood are bad. I couldn't tell you whether the kid pulled the covers off of them or not or whether they were covered or not."
Mr. Stovall, the neighbor who took the photographs, also testified at trial. Mr. Stovall, who the trial court noted "admittedly is a slow learner," testified that he had lived next door to Ms. Taylor for about three years. On the day of the accident, he was returning from the store when he saw Ms. Taylor and her child on the ground. He testified that Ms. Taylor told him that she was hurt and instructed him to go get a camera to take pictures, which he did. Mr. Stovall further testified that he likewise fell into one of the holes that ELI dug in the neighborhood sometimes after Ms. Taylor's fall.
Lynell Jones, a third neighbor, was called as a witness by ELI.[3] Ms. Jones testified that she was not present when *937 Ms. Taylor fell. When questioned regarding whether ELI always covered the holes with plywood, she responded that they did not. More precisely, she testified that there was no plywood covering the hole on which Mr. Stovall fell until after Ms. Jones called 911 for him and that the hole Mr. Stovall fell in was "filled with gravel and dirt because Keith [Stovall] slide[d] into it." Ms. Jones further testified that only some of ELI's holes were marked with barricades or stakes in the middle of them.
ELI's corporate representative, Patrick M. Fitzgerald, testified by deposition. Mr. Fitzgerald described the work that ELI was doing in the area of Ms. Taylor's double as "installing a main in the sidewalk area, where [it] would excavate and directionally bore the gas main and then install[ing] the gas services to each individual house." To do this work, ELI had to "put some holes [in the sidewalk] to get underground to lay pipe." Stated another way, "[e]ach excavation was there to allow [ELI] to directionally bore underneath the sidewalk." He further stated that a hole had to be installed over each service line and at each corner and that a hole was open for an average of four days.
Articulating ELI's procedures for safeguarding such work site holes, Mr. Fitzgerald testified by deposition that the company's policy was to: (i) barricade all excavations, (ii) use caution (safety) tape to encircle the barricades, and (iii) cover the hole with plywood. When asked whether the job site warnings were ever removed during the night leaving the holes open in the morning, Mr. Fitzgerald replied no. Mr. Fitzgerald, however, acknowledged that he did not work at this site and identified the individuals who actually worked at the site in question (Mark Johnson, A. Smith, E.P. Johnson, L. Jenkins, Daniel Brumfield, and Donald Bordelon). When asked whether these individuals were still in ELI's employment, Mr. Fitzgerald acknowledged that two of them were (Mr. Brumfield and Mr. Johnson).[4] ELI, however, failed to call any of those individuals who actually worked at the site in question to testify at trial.
As to the nature of her injuries, Ms. Taylor introduced her medical records, bills, and the testimony of her treating orthopedic specialist, Dr. L.S. Kewalramani.
The records include a report from Dr. Isadore Brickman, who was Ms. Taylor's initial treating physician. Dr. Brickman's report states that he first saw Ms. Taylor on April 20, 1998, and that she was three months pregnant. She related to him an accident on April 12, 1998, when she fell to the ground trying to retrieve her daughter from a hole and hit her lower back, the back of her left leg, and her left knee on the concrete. She immediately experienced pain in her lower back, and the next day morning, she awoke with pain in her left knee and the back of her left leg. Dr. Brickman's opinion was that she had lumbosacral spine sprain/contusion and left thigh and left knee contusion/sprain. He placed her on total disability status. Due to her pregnancy, Ms. Taylor was unable to take medication or undergo X rays. Her pain persisted and her lumbar pain increased in severity during the later months of her pregnancy. According to Ms. Taylor, this was the first time she experienced back pain during a pregnancy.
Following the delivery of her baby in August 1998, Dr. Brickman ordered an MRI of her lumbar spine. That MRI was taken in April 1999 and revealed two bulging discs. Dr. Brickman then recommended *938 that Ms. Taylor see an orthopedic specialist, Dr. L.S. Kewalramani,
At trial, Dr. Kewalramani, an orthopedic rehabilitation physician, was qualified as an expert in orthopedics not specializing in surgery. He testified that he first saw Ms. Taylor on October 6, 1999. On that visit, she gave a history of an accident on April 12, 1998, when she was walking with her daughter, who fell in a large hole approximately four feet deep and about four to five feet wide. He noted that she had preservation of the lumbar lordosis (i.e., excessive forward curvature of the lower part of the spine), increased tissue turgescence (i.e., swelling of tissue, when fluid accumulates underneath), muscle spasm, localized tenderness, and restricted lumbar motions. He further noted that she complained of having deep-seated, constant, aching pain along the lumbar and sacral region and a cracking type of feeling in the back, extending along buttocks and thighs, and episodic shock components (i.e. sharp pain episodes). She further complained that the pain was aggravated by sitting in one position for any length of time, bending and stooping, and by changes in the weather.
Based on the history provided by Ms. Taylor regarding the onset of pain as coinciding with the accident, he testified that "[c]linically, she presents as chronic lumbar musculoligamentous pain syndrome with mechanical disc dysfunction." Dr. Kewalramani also reviewed the MRI taken of Ms. Taylor in April 1999 showing bulging discs at two levels. Factoring in her relatively young age (30 years old) and her slight obesity (185 pounds), Dr. Kewalramani testified that he believed the trauma of the accident caused her asymptomatic condition to become symptomatic because these type changes are slow to develop. He further testified that a bulging disc in a 30 year old is not an unusual phenomenon, but it is unusual for same to become symptomatic.
At the time of trial, Ms. Taylor had incurred $4,080 in medical expenses, and Dr. Kewalramani testified that Ms. Taylor was still complaining of pain. As to future medical treatment, Dr. Kewalramani testified that he could not determine if surgery was needed until further testing was completed. He recommended she undergo at least two further tests; particularly, he recommended an EMG/nerve conduction study (costing between $800 to $1,100) as well as a discography (i.e., a disc protraction test with CT scan)(costing between $2,000 to $2,400). Finally, Dr. Kewalramani opined that Ms. Taylor's condition is permanent given that she has a bulging disc at two levels and facet joint hypertropic changes.
Based on the above evidence, the trial court ruled in favor of Ms. Taylor and against ELI, finding "that she fell into an area being worked on by [ELI]." The trial court further found there was "some comparative negligence on behalf of the plaintiff for failing to see the hole that is even quite obvious from the picture that it was there." Although the trial court entered judgment in favor of Ms. Taylor and against ELI in the amount of $25,000, the court's oral reasons for judgment, quoted above, reflect that it found Ms. Taylor 50% at fault and expressly stated that "[t]he fault has already been applied" in arriving at the award of $25,000. Although Ms. Taylor filed a motion to amend the judgment to reflect that she was awarded $50,000, which was reduced to $25,000 as a result of the trial court's allocation of 50% fault to plaintiff, that motion apparently was denied. In any event, we note the correct procedural mechanism to cure this substantive error in the wording of the judgment was a motion for new trial, and La. C. Civ. Pro. Art.1971 authorizes a *939 court to grant a new trial on its own motion. Given the trial court's intent is clear and given both sides agree that was the trial court's intent, we construe the judgment before us as one awarding a total of $50,000 in damages, but reduced by 50% for Ms. Taylor's comparative fault to $25,000.
On appeal, both sides assert only one assignment of error. ELI assigns as error the trial court's legal conclusion, without making the necessary factual findings, that ELI was strictly liable to Ms. Taylor. Ms. Taylor assigns as error the trial court's failure to find ELI solely at fault.

STANDARD OF REVIEW
We review the trial court's factual findings under the manifest error standard of review. Synthesizing that standard, the Supreme Court in the oft-cited case Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), stated:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
ELI contends that Ms. Taylor's story of a dramatic fall into a five-foot deep hole is physically impossible given the photographs taken "moments" after the accident. It follows, ELI contends, that this case falls within the exception to the manifest error rule "where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story." Cuevas v. City of New Orleans, 99-2542, p. 3 (La. App. 4 Cir. 6/21/00), 769 So.2d 82, 84-85 (citing Rosell, 549 So.2d at 844-45). In support, ELI cites a case in which the appellate court, based on photographs and testimony, found the trial court was manifestly erroneous in crediting the plaintiff's "physically impossible" story. Killough v. Bituminous Cas. Corp., 28329, pp. 7-8 (La. App. 2 Cir. 5/8/96), 674 So.2d 1091, 1098. Such is not the case here.
In this case, although the photographs depicted only an excavated, uncovered area, at best, a few inches deep that was filled with sand and gravel, Ms. Taylor testified that she fell into a hole that was a few feet deep and her testimony was corroborated by Mr. Rice's deposition testimony. Thus, Ms. Taylor's story, unlike the plaintiffs story in the Killough case, was supported by testimony. Moreover, it was not implausible for the trial court to infer from the testimony that the hole in which Ms. Taylor fell was located underneath the plywood. As Ms. Taylor suggests, the hole in which she fell apparently was covered at some time between her fall and Mr. Stovall's arrival to find her on the ground, as opposed to in the hole. Mr. Rice apparently arrived before Mr. Stovall, as he testified he saw Ms. Taylor in the hole helping her child out of it. That Ms. Taylor may not have correctly estimated the exact depth of the hole does not mean the trial court was manifestly erroneous in finding in her favor.
Another reason ELI cites for departing from the manifest error standard in this case is that the trial court applied the incorrect law. ELI contends that the trial court apparently found it strictly liable under La. C.C. art. 2317 for this case arising out of an accident governed by La. C.C. art. 2317.1. We disagree. Given that ELI acknowledges that the hole in question was created by its personnel, we find *940 this case governed solely by La. C.C. art. 2315. Fontenot v. Fontenot, 93-2479 (La.4/11/94), 635 So.2d 219. In Fontenot, supra, the Supreme Court held that "[w]here plaintiffs prove that a defendant is the actor directly responsible for the creation of an unreasonable risk of harm which causes injury, regardless of the location, that defendant may, depending on the results of a duty-risk analysis, be held liable as the tortfeasor." 635 So.2d at 222, n. 8 (emphasis in original). In that context, the Court held that the "scienter requirement"the reasonably knew or should have known standardwas not applicable. 635 So.2d at 222. Given that La. C.C. art. 2317.1 imposes as "scienter" requirement, providing, in part, that it must be shown that the owner or custodian "knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage," that Article is inapplicable. This case is governed solely by La. C.C. art. 2315.

DUTY-RISK ANALYSIS
The duty-risk analysis Louisiana courts apply in determining whether a defendant is liable for negligence under La. C.C. art. 2315 requires a plaintiff establish four elements by a preponderance of the evidence; namely:
(1) The conduct in question was a cause in fact of the resultant harm;
(2) The defendant owed a duty to plaintiff;
(3) The duty owed was breached; and
(4) The risk or harm caused was within the scope of the breached duty.
635 So.2d at 223.
First, as discussed, we find Ms. Taylor proved at trial that ELI was a cause-infact of the injuries and damages she sustained in that its personnel created the hole in which she fell.
Second, a duty is imposed on "one doing construction work to properly label, mark, or barricade places in the construction site that present an unreasonable risk of harm to persons using the area." Carr v. Boh Bros. Constr. Co., 557 So.2d 356, 358 (La.App. 4th Cir.1990); see Dupree v. City of New Orleans, 99-3651, p. 15 (La.8/31/00), 765 So.2d 1002, 1013 (recognizing duty of one with garde of unreasonably dangerous thing to "properly and adequately label, mark, or barricade places in that site so as to provide adequate and reasonable warning to persons using the area.") ELI clearly owed this duty to Ms. Taylor, as well as anyone else using the sidewalk in question, to properly label, mark or barricade the construction work site hole it created.
Third, the pivotal issue in this case is whether the trial court was manifestly erroneous in finding ELI breached this duty. ELI's sole support for its contention that it did not breach its duty is the deposition testimony of its corporate representative, Mr. Fitzpatrick, who admittedly did not work at this site, regarding the established company policies for safeguarding such work site holes. According to ELI, it knew that the excavated site "(1) was filled with dirt and gravel at a level flush with the street, (2) was marked with a barricade and with yellow caution tape, and (3) was covered with a sheet of plywood." ELI thus contends that it acted "reasonably" in using barricades, plywood, and yellow caution tape to mark this level, but unpaved, patch of sidewalk while it was installing needed gas service.
Ms. Taylor counters that ELI's policies were not regularly followed. In support, Ms. Taylor cites the testimony of her neighbors (Mr. Rice and Ms. Jones) to the effect that these company policies were not always employed. As noted, Mr. Rice testified that he saw work site holes uncovered; *941 Ms. Jones testified that neither plywood nor barricades were always used. Ms. Taylor also argues that ELI's failure to call one of the employees who actually was responsible for implementing these procedures and who had "unique knowledge about the accident work site" gives rise to a presumption that their testimony would have been adverse. In support Ms. Taylor cites Davis v. Myers, 427 So.2d 648, 649 (La.App. 5th Cir.1983), which held that "[w]hen a defendant in a civil case can by his own testimony throw light upon matters at issue, necessary to his defense and particularly within his own knowledge, and fails to go upon the witness stand, the presumption is raised and will be given effect, that the facts, as he would have them do not exist." Id.
The "uncalled witness" rule has been defined as an adverse presumption that arises when "a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence" and fails to call such witnesses. 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (1999). A party's failure to call such witnesses gives rise to the presumption that "the witnesses' testimony would be unfavorable to him." Id. Although the advent of modern, liberal discovery rules has been recognized to limit this rule, it "remains viable." Id. Indeed, this court has recognized this rule applies when, as in this case, witnesses with peculiar knowledge of material facts pertinent to the case are not called. Stewart v. Great Atlantic and Pacific Tea Co., 657 So.2d 1327, 1330 (La.App. 4 Cir.1995); Gurley v. Schwegmann Supermarkets, Inc., 617 So.2d 41, 44 (La.App. 4th Cir. 1993). We have also noted that "[t]he court may consider this presumption as it would any other relevant evidence in the case." Id.
In this case, we find it appropriate to invoke the adverse presumption rule. Despite testimony from the neighbors (Mr. Rice and Ms. Jones) that ELI's company policies for safeguarding work site holes were not always implemented, ELI failed to call any of the employees actually responsible for implementing those policies at the work site hole in question. Moreover, ELI's corporate representative acknowledged that at least two of those employees were still in its employ. Given the neighbors' testimony coupled with the adverse presumption rule, we conclude that the trial court was not manifestly erroneous in finding ELI breached its duty.
The final element in the duty-risk analysis is ease of association. We readily find an ease of association between the duty to safeguard a construction work site and the risk that a passer-by would trip and fall into an inadequately marked or uncovered hole and sustain injuries.
In sum, we find that Ms. Taylor established all four of the duty-risk elements, and affirm the trial court's finding of fault on the part of ELI for the injuries and damages sustained by Ms. Taylor.

COMPARATIVE FAULT
Although the trial court found ELI at fault, it also found comparative fault on Ms. Taylor's part, reasoning:
"The court does however find some comparative negligence on behalf of the plaintiff for failing to see the hole that is even quite obvious from the picture that it was there.
In light of her situation, of what a reasonable person would do at the time, given the fact that she was walking with her minor child, perhaps she could have been a little distracted, but the court is of the opinion that you need to watch where you walk...."
*942 As noted, Ms. Taylor cross-appealed asserting that the trial court's finding that her own negligence contributed to her injuries was manifestly erroneous.
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the Supreme Court enunciated the following six factors to be applied in comparing the degrees of fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required the actor to proceed without proper thought; and (6) the relationship between the actor's conduct and the harm to the plaintiff. Maldonado v. Louisiana Superdome Comm'n, 95-2490, pp. 9-10 (La.App. 4 Cir. 1/22/97), 687 So.2d 1087, 1093. Whether comparative fault applies in a given case is a factual determination governed by the manifest error standard of review; hence, "[o]nly if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages." 95-2490, at p. 10, 687 So.2d at 1093 (citing Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 610-11).
Applying those principles to the evidence presented in this case, we fail to find manifest error in the trial court's finding that Ms. Taylor was at fault in causing her injuries. Although Ms. Taylor testified that she was unaware of the hole until after her child fell into it, the trial court found the hole to be an obvious defect. Contrary to Ms. Taylor's testimony that she was unaware that ELI was working in the area, her neighbors' testimony indicated that ELI had been working in the neighborhood for some time. While we acknowledge Ms. Taylor's need for haste in attempting to rescue her child from the hole, the evidence does not suggest any extenuating circumstances that prevented her from seeing what such should have seen. Based on our application of the Watson factors to the evidence presented, we cannot say the trial court erred in assigning 50% fault to Ms. Taylor. See Jones v. Peyton Place, Inc., 95-0574, pp. 9-11 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 762-63 (allocating 30% comparative fault for plaintiff's failure to see "open and obvious" defect he should have seen).
Given that ELI does not assign as error either causation of damages or quantum, we do not address those issues.[5]

DECREE
For the reasons assigned, we affirm the judgment of the trial court and order that each party bear its own costs.
AFFIRMED.
NOTES
[1] The trial court found no inconsistency in the testimony regarding whether it was day light or night time at the time of the accident. The court noted that given the time of year Easterand the time of the accident7:30 p.m.some might refer to it as night and others as day.
[2] Although the petition seeks damages on behalf of the minor child, none were awarded, and plaintiff's cross-appeal does not assign as error that aspect of the judgment.
[3] Although defendants place great emphasis on Ms. Taylor's alleged promise to give Ms. Jones something in return for her testifying at a deposition and her alleged threatening of this witness on the eve of trial, the trial court rejected these contentions as factually baseless.
[4] Three of these individuals (A. Smith, E.P. Johnson, and L. Jenkins) actually were employees of a labor force ELI uses, Norco Construction.
[5] See earlier discussion of medical evidence supporting award of damages to Ms. Taylor for injuries arising out of the accident in question.