Judgment rendered April 5, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,364-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SANCTUARY CAPITAL, LLC,              Plaintiffs-Appellees
ET AL., ON BEHALF OF NORTH
LOUISIANA BIDCO, LLC


versus


RICHARD D. CLOUD, JAMES              Defendants-Appellants
RANDOLPH GARNER, AND
NORTH LOUISIANA BIDCO, LLC

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2014-1379


Honorable Daniel Joseph Ellender, Judge

* * * * *

RICHARD A. ROZANSKI, APLC            Counsel for Appellant,
By: Richard A. Rozanski             North Louisiana Bidco, LLC


BREITHAUPT, DUBOS, &                 Counsel for Appellants,
WOLLESON, LLC                        Richard D. Cloud and
By: R. Alan Breithaupt              Nephos, LLC
    James R. Close


HECK LAW FIRM, LLP                   Counsel for Appellant,
By: Charles H. Heck, Sr.            James Randolph Garner
    Charles H. Heck, Jr.


NELSON, ZENTNER,                     Counsel for Appellees,
SARTOR & SNELLINGS                   Sanctuary Capital, LLC,
By: David H. Nelson                 J. Bishop Johnston, W. Clinton
    George M. Snellings, IV         Raspberry, Jr., MCS Two, LLC,
                                     O. A. Cannon, Jr., Nelson
                                     D. Abell, III, R. Stewart Ewing,
                                     Jr., Carolyn W. Perry, Annette
                                     Williams Carroll, Molly
                                     Williams, and Clarke M.
                                     Williams, III, on Behalf of
                                     North Louisiana Bidco, LLC

* * * * *

Before STONE, COX, and O'CALLAGHAN (Pro Tempore), JJ.

**COX, J.**

This suspensive appeal arises out of the Fourth JDC, Ouachita Parish, Louisiana. The plaintiffs in this case are as follows: Sanctuary Capital, LLC, J. Bishop Johnston, W. Clinton Raspberry, Jr., MCS Two, LLC, O. A. Cannon, Jr., Nelson D. Abel, III, R. Stewart Ewing, Jr., Carolyn W. Perry, Annette Williams Carroll, Molly Williams, Clark M. Williams, III, and North Louisiana BIDCO, LLC ("NLB") (collectively referred to as "Plaintiffs"). The defendants are Richard Cloud, Randolph Garner, and NLB (collectively referred to as "Defendants"). Defendants appeal the trial court's judgment in favor of Plaintiffs, which allowed Plaintiffs access to business records and deferred Plaintiffs' claim for attorney fees. For the following reasons, we affirm the trial court's judgment.

## FACTS

NLB was organized in 1999 and licensed as a Business Industry Development Corporation (BIDCO) to provide financing to small businesses in North Louisiana.[1] In 2000, its members executed a detailed Operating Agreement which provided, in part, for the management and control of the company; the agreement named Cloud and Garner as the company's managers.

---

[1] This license is provided under the "Louisiana BIDCO Act". La. R.S. 51:2386, *et seq.* The purpose of a BIDCO is to promote economic development by encouraging the formation of business and industrial development companies, a new type of private institution, to help grow the financial services industry in Louisiana, create high-paying job opportunities in this sector, and meet the financing assistance and management assistance needs of business firms in this state and elsewhere. La. R.S. 51:2387(1). Generally, BIDCOs provide financing to businesses that cannot otherwise obtain financing from a traditional bank.

The Operating Agreement provides, in part:

ARTICLE IV.
…

D. Duties of Parties.
…

3. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.
…

ARTICLE VIII.
…

B. Books and Records.

1. The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company for the last three most recent years; a copy of the articles of organization and operating agreement and all amendments to the articles and operating agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, and local tax returns for the last three most recent years.

2. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

…

ARTICLE IX.

A. Mediation.

1. Agreement to Use Procedure. The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that same spirit of cooperation that they pledge to attempt to resolve any dispute amicably without the necessity of litigation. Accordingly, they agree if any dispute arises between them relating to this

Agreement (the Dispute), they will first utilize the procedures specified in this Article IX (the Procedure) before any Additional Proceedings are commenced. The Disputing Members agree and commit themselves to participate in the proceedings in good faith with the intention of resolving the Dispute if at all possible.

…

ARTICLE XI.

…

W. Membership Rights means all of the rights of a Member in the Company, including a Member's: (A) Interest; (B) right to inspect the Company's books and records; (C) right to participate in the management of and vote on matters coming before the Company; and (D) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

In September 2013, NLB, Cloud, Garner, and two other companies affiliated with Cloud and Garner were sued by Craig Taylor, Inc. ("CTI"), a company with which these defendants had engaged in business dealings. CTI demanded, among other things, a money judgment against NLB, Cloud, and Garner. CTI's 185-paragraph petition alleged that Cloud and Garner engaged in various acts of self-dealing with NLB, fraud, and forgery. This suit by CTI was settled out of court.

On May 2, 2014, Plaintiffs, who are 11 minority members of NLB, filed a petition which they captioned as a derivative action; this action was combined with a demand for injunctive relief. Plaintiffs urged that they sought to enforce NLB's own right to examine the company's "financial and other" records, an effort that had been impeded by Cloud's and Garner's refusals to make the records available to them. Plaintiffs asserted that they wished to review the records because of CTI's allegations of wrongdoing against Cloud and Garner and a $6 million bad debt expense on NLB's 2013

3

financial statement. Plaintiffs requested the following documents from

Cloud and Garner:

1. Detailed general ledgers
2. Signed federal tax returns
3. Signed state tax returns
4. Peachtree (or comparable accounting system/software) electronic file(s)
5. Board of Directors minutes
6. Board of Directors correspondence
7. Audited financial statements
8. Monthly bank statements
9. Monthly bank reconciliations
10. Daily cash reports
11. Correspondence between NLB and financial institutions (e-mails, notes from phone conversations, letters, etc.)
12. Listing of all financial institutions' names, addresses, e-mail addresses, and phone numbers
13. Listing of all debtors' (customers) names, addresses, e-mail addresses, and phones numbers
14. All correspondence between NLB and its debtors (e-mails, notes from phone conversations, letters, etc.)
15. Approved credit memos
16. All loan agreements
17. Documents related to the underwriting/approval of loans and investments
18. Documentation for loan write-offs, if any (correspondence with customer, policy for bad debts, etc.)
19. Annual amortization schedules
20. Monthly statements for all loans
21. Schedule of monthly interest expense calculations for all loans
22. Proof of all payments made towards loan balances
23. Compensation schedule for owners, including all benefits and personal expenses
24. Quarterly reports provided to the Commissioner of the Louisiana Office of Financial Institutions
25. Economic impact reports provided to the Commissioner of the Louisiana Office of Financial Institutions
26. Communications with the Louisiana Office of Financial Institutions, including but not limited to, affiliated party disclosures, changes in policy, and changes in business activity.

In response, Defendants raised an exception of prematurity, citing

NLB's arbitration clause. The trial court granted the exception of

prematurity and dismissed Plaintiffs' action. Plaintiffs appealed that

decision to this Court.

In *Sanctuary Capital, LLC ex rel. N. Louisiana BIDCO, LLC v. Cloud*, 49,766 (La. App. 2 Cir. 4/15/15), 163 So. 3d 890, *writs denied*, 2015-0947, 2015-0951 (La. 8/28/15), 176 So. 3d 404 ("*Sanctuary I*"), this Court held the issue was not a dispute between members of the LLC and the dispute was not related to the Operating Agreement, so the arbitration agreement did not apply. The matter was remanded for further proceedings.

Defendants filed dilatory exceptions of improper use of summary proceedings due to the Plaintiffs' request for a mandatory injunction, which required a trial on the merits. The exceptions were granted at a hearing on September 26, 2016, at which the trial court ruled a summary proceeding was not authorized and the case was to be converted to an ordinary proceeding. The trial court ordered that Plaintiffs file an amended petition converting the case to an ordinary proceeding.

On February 15, 2017, Plaintiffs filed their first amending, supplemental, and restated petition for breach of contract and damages, adopting by reference the allegations contained in the original petition. Plaintiffs stated they were bringing suit against Cloud and Garner only in their capacities as managers. They alleged that Cloud and Garner "intentionally breached and violated the clear and unequivocal provisions set forth in Article VIII of NLB's Operating Agreement," breached their duties owed to Plaintiffs to make NLB's books and records available for examination, and acted in bad faith in refusing to turn over the books and records to Plaintiffs. Plaintiffs reserved the right to bring additional claims against Cloud and Garner after inspecting NLB's books and records.

In response, NLB filed dilatory exceptions of prematurity and improper joinder of parties and peremptory exceptions of nonjoinder of a

5

party and res judicata; Garner filed a declinatory exception of insufficiency of service of process, dilatory exceptions of prematurity, lack of procedural capacity, improper joinder of parties, improper cumulation of actions, vagueness, and peremptory exceptions of no cause of action and res judicata; Cloud filed a peremptory exception of no cause of action, dilatory exception of prematurity, dilatory exception of lack of procedural capacity, dilatory exception of improper joinder of parties, dilatory exception of improper cumulation of actions, and peremptory exception of res judicata.

Defendants again argued the matter should first be submitted to mediation and arbitration based on NLB's arbitration clause. They asserted that the current members of NLB who were not participating as plaintiffs should have been joined as defendants in the suit. They argued that Plaintiffs were re-urging and reiterating all of their claims, demands, and causes of action from the original petition, which was the subject of the improper use of summary proceedings judgment; therefore, the issues are subject to res judicata. They cited *Sanctuary I* to support the contention that the initial petition made no claims and did not state a cause of action. Plaintiffs opposed the exceptions.

On May 15, 2017, after hearing the arguments of the parties, the trial court orally denied Defendants' exceptions. The trial court denied the exceptions of prematurity on the basis that this Court had already addressed the issue in *Sanctuary I*. The trial court denied the exceptions of no cause of action, holding that Plaintiffs had stated a cause of action against Cloud and Garner, individually, under a broad reading of La. R.S. 12:1320. The judgment was signed on May 30, 2017. Defendants individually filed notices of intent to seek supervisory review. This Court denied the writs on

the showing made. The Louisiana Supreme Court also denied their writ applications. *See Sanctuary Capital, LLC ex rel. N. Louisiana BIDCO, LLC v. Cloud*, 2017-1845, 2017-1858, 2017-1857 (La. 1/9/18), 231 So. 3d 650, 653.

In April 2018, Defendants individually answered the suit and alleged that Plaintiffs had been provided all records to which they were entitled under the Operating Agreement and pled the affirmative defense of extinguishment.

On November 29, 2018, Garner filed another exception of no cause of action, in which he asserted that he should not be subjected to the risk and expense of a trial based upon the petitions which stated no definitive claims against him. On January 17, 2019, Cloud also filed another exception of no cause of action in which he adopted and incorporated by reference portions of Garner's exception. Plaintiffs filed an opposition to the exceptions on February 4, 2019.

A hearing on the exceptions was held on February 22, 2019. The trial court granted the exceptions of no cause of action. Plaintiffs appealed that judgment. In *Sanctuary Capital, LLC on Behalf of N. Louisiana BIDCO, LLC v. Cloud*, 53,157 (La. App. 2 Cir. 11/20/19), 285 So. 3d 123 ("*Sanctuary II*"), this Court reversed the trial court's judgment and held that allegations that Cloud and Garner intentionally breached the records inspections provisions of NLB's Operating Agreement were sufficient to state a cause of action for violation of fiduciary duties.

After this Court's ruling in *Sanctuary II*, Defendants filed a motion to stay pending arbitration and petition for order directing that arbitration proceed. They argued that this Court "confirmed this case involves

7

application and interpretation of the Operating Agreement and disputes among members" and cited footnote seven from *Sanctuary II*, in which this Court stated:

> Issues pertaining to the applicability of the mediation/arbitration provisions contained in the operating agreement are not before us in the current appeal. Our opinion in the prior appeal in this case was restricted to the allegations made in the original petition. The plaintiffs have since expanded their claims and are now seeking monetary damages against Cloud and Garner. These new claims may be subject to the mediation/arbitration provisions contained in the operating agreement. The defendants, if they deem it appropriate, should be afforded a reasonable opportunity to exercise any rights to enforce those mediation/arbitration provisions. The plaintiffs, of course, would have the right to argue otherwise. We express no opinion on how the trial court should rule upon such a matter.

Plaintiffs opposed the motion and argued Defendants' motion was duplicative of prior motions that had been rejected by the court. They asserted that the amended petition only made clear that they were bringing claims against Cloud and Garner in their capacities as managers.

After a hearing on the matter, the trial court signed a judgment denying Defendants' motion and petition for arbitration. Defendants sought review from this Court. Their writs were denied on the showing made.

Defendants individually filed amended and supplemental answers to add the affirmative defenses of extinguishment, prescription, and peremption.

A bench trial was held on November 9 and 10, 2020. Cloud testified that it is his contention that Plaintiffs are not entitled to look at any of the following: loan agreements; documents related to the underwriting or approval of loans; documents concerning the write-off of loans or correspondence with the customer, borrowers, or any policy for bad debts; proof of payments made toward loan balances; and loan portfolios,

8

promissory notes, or loan history. He stated external auditors view these records as part of their standard audit requirements.

Cloud testified that the December 2012 audit showed related party transactions totaled $6,643,928 and the 2017 audit showed $6,773,119 in related party transactions. All the related party transactions included an ownership interest of Cloud, Garner, or any company in which Cloud or Garner held an interest. He stated the 2018 audit showed $6.7 million in related party transactions were moved to allowance for credit losses. Cloud testified that they decided to move these related party transactions because it became "doubtful that [they] would be able to collect them." He stated this decision was made after discussions with their auditors and the Office of Financial Institutions ("OFI"), which oversees Louisiana BIDCOs.

Cloud testified that as of April 25, 2018, Plaintiffs were given audited financial statements, tax returns, general ledgers, account reconciliation sheets, and bank statements. He stated Plaintiffs were not given loan documents or information concerning related party transactions, which he contends are supporting documents, not books and records.

Cloud testified that he and Garner tried to meet with Plaintiffs regarding the document request. He stated they intended to have their auditor there as well to talk or answer any questions Plaintiffs had. He testified that he considers books to be "primarily the financial transactions and status of the company," and records "are the organizational and structural documents of the company, delineating the rights and responsibilities of the various parties in there, and identifying who they are and what percentages they own of the company."

Cloud stated that OFI regulated NLB and issued a yearly report, which was made available to the Board and managers. He testified that OFI regulated Board attendance and required 80 percent attendance. Cloud stated that they struggled with Board attendance and tried paying $500 per attendance and meeting over conference calls, but they still had issues with attendance. He testified that low attendance was the reason the entire Board was removed, but some members were later reappointed.

Cloud explained how he and Garner became related parties to CTI. He stated it was originally called Jenson Holdings and had qualified for a $400,000 loan (approximately). He testified that later, he and Garner invested $100,000 each in Jenson Holdings and it became known as CTI. Cloud stated that their investment allowed CTI to qualify for a larger loan.

Cloud testified that the loans to CTI, Acadian Building Components, and Universal Electric, which totaled approximately $6.7 million in related party loans, were in pools certified by the State for a little over $17.5 million. He explained that because they made those three related party loans, even though they were not paid back, they were able to keep the $17.5 million from the pools; therefore, they had a gain of $10.8 million. He testified that had they not made those related party loans, they would not have reached 100 percent, which means they would have lost the entire $17.5 million from the pools. However, the related party loans ensured they could reach 100 percent; thus, their gain was $17.5 million minus the $6.7 million loss on the related party loans that were not repaid, which is a net gain of $10.8 million. Cloud stated this gain was distributed among the members of NLB.

Garner testified that he has been a manager of NLB since it was formed and owns a 25 percent interest. He stated that Garner Family, LLC, of which he is a member, borrowed the following amounts from NLB: $215,000 in 2006; $431,000 in 2006; $215,000 in 2007; and $360,000 in 2017. Garner testified that any loans made to his or Cloud's family businesses have been repaid. Garner stated he is also a member of Capital Innovations, LLC, which appears in the audit statements. He testified that he owns 40% of Acadian Building Components, LLC, which had a $2.9 million loan from NLB. He stated that he and Cloud each own 20% in CTI, and CTI received a $2.6 million loan from NLB. Garner testified that he and Cloud had ownership interest in Universal Electric Supply, LLC when it received a $1.2 million loan from NLB.

Rand Falbaum testified that he originally owned a portion of NLB as an individual, but he later converted his interest into Sanctuary Capital, LLC. He stated that early on, the related party transactions were "relatively minor." He testified that in the fall of 2008, the Board, of which he was a member, requested that related party transactions be presented to them for approval. Falbaum stated that minority members, including himself, were asked to leave the Board. He testified that when he and other minority members became aware of the CTI lawsuit against NLB in 2013, they requested information regarding related party transactions and loan documents in order to determine whether CTI's claims were valid; those requests were denied. Falbaum testified that as of the trial date, he had not been provided with the requested documents.

Falbaum stated he received audit statements from NLB every year, along with every other member of NLB. He testified that the audit

statements included related party transactions. On cross examination, he was asked, "But you acknowledge that if you had read the financial statements you would have known about [the related party transactions] would you have not?" Falbaum responded, "Which I did in 2014. Yes, sir."

Jody Lyle, J. Bishop Johnston's daughter, testified as a minority owner of NLB. She stated that her father invested in NLB in 2000 and she was put on the Board in 2004 as a representative of her father. She testified that she was removed from the Board in 2008 when the Board was reduced in size and the cited reason was Board attendance. Lyle was questioned about her father's email requests for documents and his intent, to which she declined to speculate.

Morris Mintz testified that he owns MSC Two, LLC, which is an owner of NLB. Mintz stated that he was on the Board after investing in NLB in 2000. He testified that he was removed from the Board at the same time as Lyle and other members after requesting transparency in the related party transactions. Like Lyle, the cited reason for his removal from the Board was attendance.

Chad Garland, a certified public accountant, was accepted as an expert in the fields of certified public accounting and forensic auditing. Garland testified that he was contacted by Falbaum in connection to this case. He stated that he helped Falbaum prepare a list of documents needed from NLB to review. He stated, "The main asset for this company is the loan documents. Without an analysis of the loan documents the company is a shell. So, it's – you cannot do any type of forensic analysis of the loans or related party loans or any type of loan without having the loan documents." Garland testified that he would need the loan documents, not just the audit

12

statements, to know whether the related party transactions were done at arm's length and on commercially reasonable terms.

After Plaintiffs presented their case, Defendants filed a motion to dismiss pursuant to La. C.C.P. art. 1672. They argued the claims prescribed because they were not brought within one year from the date of discovery. The trial court deferred ruling on the motion until all evidence was submitted.

Stephen Craig, a certified public accountant and auditor, was accepted as an expert in financial institution auditing and as a certified public accountant. Craig testified that he, along with his team, performed independent audits of NLB since its inception. He stated that as a part of his auditing process, he verified the supporting documents of NLB. He stated that when auditing NLB, he did not use a sample of the loans to verify NLB transactions, but he looked at all of them because there was not "a significant amount of loans" processed each month. He stated that he did not agree with Garland's testimony that additional information and access to electronic data are needed because he performed his audit using a hard copy of the general ledger every year.

Craig testified that OFI performs its own analysis of NLB and issues a report. He stated he gets a copy of OFI's report every year and it is basically the same as his audit, but it is a little more detailed in loan classifications. He testified that the OFI reports will sometimes include detailed information about particular loans if the loan is classified and they want to discuss it with management.

Craig described and explained his audit reports of NLB. Through answers elicited by defense counsel, Craig highlighted notes payable to

members and related parties. He stated the reports provided balances of those notes. He testified that he is required to disclose all related party transactions, including things like building leases. He testified that if a loan originates as a nonrelated party, but later becomes a related party, the loan is reported on all subsequent reports as a related party loan. Craig stated that he relies on management to determine the relationship dynamics of a transaction. He agreed that it makes his job more difficult if management is not truthful.

The trial court allowed the parties to submit post-trial briefs. On March 4, 2021, the trial court announced its ruling in open court. The trial court stated the issue of the case was which records, if any, Plaintiffs could get in addition to what had already been produced. The trial court denied Defendants' exceptions of prescription/preemption and motion for dismissal without prejudice because the basis for those objections were related to any acts or activities the managers may have done prior to the suit being filed in 2014, not whether the documents should be produced. In ruling in favor of Plaintiffs, the trial court stated, "[T]he court finds that in fact the records and books would encompass particularly for an entity like this the loan documentation as well… the records of this company would include the very core of what the company does which is the loan documentation." It stated that this decision was based on a plain reading of the Operating Agreement, the purpose of the LLC, and "a common-sense approach particularly in light of the allegations made in this unrelated third-party suit by [CTI]." The trial court stated that without being able to view the loan documents, the members would have to rely on the managers as to whether "everything was done above board," and based on the allegations in the CTI suit, Plaintiffs

are entitled to view all of the documents requested by Plaintiffs. The trial court imposed a confidentiality provision to protect the information of the customers. Plaintiffs' claim for attorney fees was deferred as premature. On April 7, 2021, the trial court signed a judgment memorializing these rulings and casting both parties with their own costs pending further orders of the court.

Defendants filed individual motions for new trial. The trial court signed orders summarily denying the motions on April 21, 2021. Defendants now appeal.

**DISCUSSION**

*Arbitration*

Defendants argue that the trial court erred in denying their petition for arbitration because Plaintiffs' claims constitute a dispute among the members of NLB arising from the NLB Operating Agreement. They claim that in *Sanctuary II*, this Court made the determination that Plaintiffs did state a cause of action against Cloud and Garner individually for breach of fiduciary duty; the breach of fiduciary duty arises out of the Operating Agreement, making this ripe for arbitration. They argue that the original petition was different from the amended petition, requiring a different result than *Sanctuary I*. They assert that the supplemental petition is against Cloud and Garner, individually, and because they are all members, it is a dispute between members. They argue it is a dispute arising out of the Operating Agreement because it seeks to enforce the right to inspect documents. Defendants cite footnote 7 in *Sanctuary II* as proof that they have a valid claim for arbitration because this Court stated they should have the opportunity to advance the argument after the petition was amended.

15

Plaintiffs assert that the enforceability of the arbitration clause has been litigated ad nauseum and nothing has changed. They highlight that this is a disagreement between members and managers, not between members. They argue a suit against managers does not trigger the arbitration clause, and the trial court's ruling should be upheld.

The "law of the case" principle is a discretionary guide which relates to (a) the binding force of a trial judge's ruling during the later stages of trial; (b) the conclusive effects of appellate rulings at trial on remand; and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. *Chanler v. Jamestown Ins. Co.*, 51,320 (La. App. 2 Cir. 5/17/17), 223 So. 3d 614, *writ denied*, 2017-01251 (La. 10/27/17), 228 So. 3d 1230.

Defendants have continued to argue arbitration applies in this case before both the trial court and this Court. This Court addressed whether the first petition should have been submitted to arbitration in *Sanctuary I* and determined that the arbitration provisions did not apply because it was not a dispute between members and did not arise out of the Operating Agreement. Plaintiffs amended their petition, adopting by reference all of the allegations contained in the original petition. The amended petition specifically states that Cloud and Garner are being sued in their capacity as managers and the allegations pertain to their roles as managers, not members. Therefore, in accordance with the analysis in *Sanctuary I*, this is not a dispute among members and the arbitration provision does not apply. This assignment of error lacks merit.

16

*Inspection of Records*

Defendants argue the trial court erred in ordering that Plaintiffs are entitled to examine and inspect documents that do not comprise NLB's books and records. They assert that Plaintiffs admitted that the scope of their request was not based on the Operating Agreement parameters. They claim Plaintiffs' demands are overly broad and did not follow the procedures to request an audit as outlined in the Operating Agreement. Defendants assert that "records" are defined in the Operating Agreement and do not include supporting documents like loan documents. They argue the definition of "books," which is not defined in the Operating Agreement, is not in dispute.

Plaintiffs argue the trial court's judgment should be upheld. They assert Defendants' definitions of books and records is too narrow. Plaintiffs argue that the documentation regarding the state of the business and its financial condition clearly includes loan documents, as this business was created solely for making loans.

A limited liability company's Operating Agreement is contractual in nature. It binds the members of the company as written and is interpreted pursuant to the law of contract. *Ark–La–Tex Safety Showers, LLC v. Jorio*, 48,478 (La. App. 2 Cir. 12/18/13), 132 So. 3d 986. Contracts have the effect of law for the parties, and the interpretation of the contract involves the determination of the parties' common intent. La. C.C. art. 2045. We must examine the words of the contract in order to determine the reasonable intention of the parties. *Powertrain of Shreveport, L.L.C. v. Stephenson*, 49,327 (La. App. 2 Cir. 10/1/14), 149 So. 3d 1274. When the words of a contract are clear and explicit and lead to no absurd consequences, no further

17

interpretation may be made in search of the parties' intent.  La. C.C. art. 2046.  A clear and unambiguous clause in a contract should not be disregarded so as to pursue its spirit; it is not the court's duty to "bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties."  *Powertrain of Shreveport, L.L.C. v. Stephenson, supra*.  Courts must interpret contracts in a "common-sense fashion," giving the words of the contract their "common and usual significance."  *Id*.  Each provision must be interpreted in light of the other provisions of the contract so that each is given the meaning suggested by the contract as a whole.  La. C.C. art. 2050.

Where factual findings are pertinent to the interpretation of a contract, those factual findings are subject to the manifest error standard of review.  *Davis v. Russell*, 44,909 (La. App. 2 Cir. 12/9/09), 26 So. 3d 950.  However, where the meaning of a contract is to be determined solely from the words upon its face, without the necessity of extrinsic evidence, the appellate courts are as competent to review the evidence as the trial court, and no special deference is usually accorded the trial court's findings.  *Schroeder v. Board of Sup'rs of La. State Univ.*, 591 So. 2d 342 (La. 1991); *Sanctuary I, supra*.

The primary issue in this matter is the interpretation of the Operating Agreement, particularly, whether it requires Cloud and Garner to give Plaintiffs the requested documents.  The definition of "records" is not limited to the list of named documents as it states, "records shall include, but not be limited to[.]"  The Operating Agreement does not include a definition of "books."  This vagueness makes the Operating Agreement unclear as to what documents must be made available to the members.  Because the words

18

of the Operating Agreement are not clear and unambiguous on its face, we give deference to the trial court's findings.

In Article VIII of the Operating Agreement, records include, but are not limited to, "complete and accurate information regarding the state of the business and financial condition of the Company for the last three most recent years" as well as tax returns and other named items. Records and documents that would be included in "complete and accurate information regarding the state of the business and financial condition of NLB" is not clear. The documents required to comprise complete and accurate information of a business and its financial condition could differ between companies, depending upon the business dealings of the company. NLB was licensed as a BIDCO and provided financing to businesses that could not obtain financing from a traditional bank. By nature, their business and its financial condition includes loan information.

Article IV of the Operating Agreement anticipates that NLB will participate in related party transactions. It states that these transactions "shall be at arm's length and on commercially reasonable terms." Loan documents from these related party transactions would necessarily detail the terms of the loan and who was involved in the transaction. These related party transactions and their terms are factors which impact the financial condition of NLB.

The CTI lawsuit put Plaintiffs on notice of allegations of self-dealing. Plaintiffs discovered that in NLB's financial statement, $6.7 million in related party transactions were moved to allowances for credit losses, which indicated NLB did not expect to collect on those loans. Therefore, the loan documents and related correspondence are necessary to determine the

19

financial condition of NLB and whether these loans were executed on commercially reasonable terms and at arm's length. As stated by the trial court, if Plaintiffs are not given the opportunity to review the loan documents and transactions, "the members would have to take the word for and of the Defendants that everything was done above board." Books and records include all documents relating to the loans. Clearly stated, the Plaintiffs, as current members of the LLC or members when the loans were generated, are entitled to see every piece of paper, check, loan document, digital record, and any other material relating to any and all loans approved or denied by NLB. All records of the business are vital for a determination of whether self-dealing took place in the matter, and no piece of paper or digital record should be withheld from examination by the members. For these reasons, we find no error in the trial court's ruling that Plaintiffs are entitled to all of the requested documents.[2]

*Deferred Ruling*

Defendants argue the trial court erred in deferring its ruling on Plaintiffs' claim for purported damages because the issue of liability was fully litigated at trial and Plaintiffs failed to satisfy their burden to show gross negligence or bad faith. They argue that Plaintiffs' claim for damages was not incidental to the right to inspect records, but part of the principal demand. Defendants highlight that Plaintiffs' only claim against them was that they breached the Operating Agreement in bad faith when they did not produce all the requested documents. They claim that because the trial court

---

[2] We recognize that Defendants have the right to file a writ with the Louisiana Supreme Court, should they choose to do so. However, once all time delays have run and this judgment regarding the documents is final, any further delay in handing over the documents may give rise to a finding of contempt of court.

20

did not find they were in bad faith, the issue of damages should not have been deferred.

Plaintiffs assert the entire point of this suit was to determine whether they are entitled to the documents they requested so that they could determine damages, if damages exist, and later present evidence to the court as to what they are owed. They argue it would be unjust to allow them to view the documents and then deny them the ability to assert damages.

The trial court stated that the only issue before it was whether Plaintiffs were entitled to the requested documents. It stated that Plaintiff's claim for attorney fees was deferred as premature. Plaintiffs reserved the right to bring damage claims after they had the opportunity to view the records. At this juncture, it was appropriate for the trial court to defer damages for attorney fees as the only issue was the withholding of documents. Although not memorialized in the judgment, the trial court stated in its oral reasons that it did not find Defendants acted in bad faith in refusing to turn over the documents because their actions were based on their understanding of the Operating Agreement. Up to this point in the litigation, all of the claims have centered around the request for documents that began in 2014.

If Plaintiffs review the documents and discover a claim for damages, they may be able to bring that claim in addition to a claim for attorney fees, if applicable. The trial court prevented a piecemeal litigation regarding damages by deferring the claim for attorney fees until all claims have been brought. Hypothetically, this prevents the trial court from ruling on attorney fees now and making an additional ruling on attorney fees at the end of litigation. If, after reviewing the documents, Plaintiffs discover they have no

21

remaining claims for damages, they may still bring a contradictory motion to determine if they should be awarded attorney fees. Either way, the issue of attorney fees is deferred until the end of litigation. Until this case reaches its conclusion, it is impossible to know what damages may be appropriate. We affirm the trial court's judgment deferring the issue of attorney fees.

*Prescription/Peremption*:

Defendants argue the trial court erred in denying their exceptions of prescription/peremption and motion for involuntary dismissal because Plaintiffs' damage claim against them is untimely. They state Louisiana law is clear that an action for damages against a manager of a Louisiana LLC for breach of fiduciary duty shall be brought within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act is discovered or should have been discovered. They assert that if the acts or omissions were in bad faith, or a knowing and intentional violation of law, the action for damages shall be brought within two years from the date of the alleged act or omission, or within two years from the date the alleged act is discovered or should have been discovered.

Defendants claim that there was no allegation of bad faith against them in the original petition and the amended petition was almost three years later, meaning it is past the two-year mark and prescribed. They argue it is clear that Plaintiffs were not timely in bringing their damage claim and therefore, the trial court erred in denying their exceptions.

Our jurisprudence reflects that the standard of review of a judgment pertaining to an exception of prescription turns on whether evidence is introduced at a hearing on the exception. Louisiana Code of Civil Procedure article 931 expressly allows "evidence [to] be introduced to support or

22

controvert [a peremptory exception] pleaded, when the grounds thereof do not appear from the petition." If no evidence is submitted at a hearing, the exception "must be decided upon the facts alleged in the petition with all of the allegations accepted as true." In that case, the reviewing court is simply assessing whether the trial court was legally correct in its finding. *Mitchell v. Baton Rouge Orthopedic Clinic, L.L.C.*, 2021-00061 (La. 10/10/21), -- So. 3d --.

La. R.S. 12:1502 provides, in pertinent part:

C. No action for damages against any person described in Subsection A of this Section for an unlawful distribution, return of an unlawful distribution, or for breach of fiduciary duty, including without limitation an action for gross negligence, but excluding any action covered by the provisions of Subsection D of this Section, shall be brought unless it is filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered, but in no event shall an action covered by the provisions of this Subsection be brought more than three years from the date of the alleged act, omission, or neglect.

D. No action for damages against any person listed in Subsection A of this Section for intentional tortious misconduct, or for an intentional breach of a duty of loyalty, or for an intentional unlawful distribution, or for acts or omissions in bad faith, or involving fraud, or a knowing and intentional violation of law, shall be brought unless it is filed in a court of competent jurisdiction and proper venue within two years from the date of the alleged act or omission, or within two years from the date the alleged act or omission is discovered or should have been discovered, but in no event shall an action covered by the provisions of this Subsection be brought more than three years from the date of the alleged act or omission.

E. The time limitations provided in this Section shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of competent jurisdiction and proper venue.

In *Sanctuary II*, this Court stated:

> The plaintiffs alleged in their original petition that suit was brought to investigate allegations of "self-dealing or any other misconduct" by Cloud and Garner, which, if substantiated, would violate the fiduciary duties imposed upon them as managers under La. R.S. 12:1314. In their first amending, supplemental and restated petition, they further asserted that Cloud and Garner, as managers, "intentionally breached" the operating agreement's provisions pertaining to review of book and records; they "have acted in bad faith" in refusing to turn over the books and records to the plaintiffs; and their actions in this protracted litigation have resulted in unnecessary legal expenses for NLB and damages to the plaintiffs as minority members of NLB.

> Based upon our *de novo* review, we find these allegations are sufficient to support a cause of action against Cloud and Garner under La. R.S. 12:1314 for violation of their fiduciary obligations.

Defendants have argued that Plaintiffs' claims are prescribed on the face of the petition, and no evidence was submitted at a hearing on the exceptions. Therefore, our role is to assess whether the trial court was legally correct in its denial of Defendants' exceptions of prescription and peremption.

Plaintiffs claimed that Defendants breached their fiduciary duties in failing to provide access to the requested documents. In *Sanctuary II*, after summarizing what was alleged in each petition, this Court stated that Plaintiffs' allegations were sufficient to state a cause of action against Cloud and Garner for breach of fiduciary duty. We read the previous opinion to include both petitions in stating that Plaintiffs asserted a cause of action against Cloud and Garner for breach of fiduciary duty. Plaintiffs alleged in their first petition that they sought the documents to investigate self-dealing and any other misconduct by Cloud and Garner, which would violate their fiduciary duties.

24

After determining both petitions stated a claim against Cloud and Garner, we must now determine if the original petition was filed in a timely manner. Plaintiffs requested the list of documents by letter on March 21, 2014, and after not receiving the documents, they filed suit on May 9, 2014. The time from the letter and the filing of the suit is less than a year and well within the time period to bring a claim for breach of fiduciary duty. The trial court properly denied the exceptions of prescription and peremption.

In both petitions, Plaintiffs reserved the right to bring additional claims after inspection of the documents. Although all of the allegations are connected to potential claims of self-dealing or improper related party transactions, those issues are not yet before us. The claim for breach of fiduciary duty for not releasing documents is not prescribed. This assignment of error lacks merit.

*Look Back Period*

Garner argues the trial court erred in not setting a "look back period." He asserts that because of the prescriptive period and requirement that management keep records for three years, the trial court should have set a time period for the requested documents. He argues that it was improper for the trial court to allow Plaintiffs to receive information prior to the three-year record retention requirement.

We reiterate that the issues currently before us are based on the *production of documents*, not whether any related party transactions were improper. We have already determined above that Plaintiffs are entitled to the documents they requested. They are minority members of an LLC whose primary business is the lending of money. As such, they are entitled to all of the documents that make up the books and financial stability of

25

NLB. Whether or not any future claims have prescribed after a review of the documents is not currently before us. Additionally, the availability of documents beyond the three-year retention requirement is not currently before us. Documents in the possession of Defendants, but outside the three-year retention window, are subject to inspection.

The Operating Agreement does not limit the time period from which the documents originate that a member may review, it only defines the time period for which the managers must retain the documents. The members were free to include in the Operating Agreement that only documents originating in the last three years are available for inspection by members. However, it clearly only addresses the length of time documents must be retained by managers. We will not read a time limitation into the Operating Agreement where the Operating Agreement is silent. We read that silence to indicate that members are not limited by the three-year retention policy in which documents they may review. All books and records are required to be made available at NLB's principal office for examination by members; therefore, all books and records which exist at the time of the examination must be made available. The Operating Agreement does not specify that a look back period would be applicable in this case. This assignment of error lacks merit.

*Cannon/Johnston Testimony*

Garner argues that although they are Plaintiffs, neither O. E. Cannon, Jr., nor J. Bishop Johnston were called to testify in this case. He asserts that they are parties and critical witnesses so an adverse presumption should apply. Plaintiffs argue that they "put on abundant evidence to prove their

26

case." They assert that any testimony that could be offered by Johnston or Cannon was unnecessary, duplicative, and cumulative.

An adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify, even though the presumption is rebuttable and is tempered by the fact that a party need only put on enough evidence to prove the case. *Driscoll v. Stucker*, 2004-0589 (La. 1/19/05), 893 So. 2d 32. A party's failure to call such witnesses gives rise to the presumption that "the witnesses' testimony would be unfavorable to him." *Taylor v. Entergy Corp.*, 2001-0805 (La. App. 4 Cir. 4/17/02), 816 So. 2d 933, *citing* 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (1999).

We do not find that adverse presumption should apply to this case. Garner asserts that Cannon was an employee of Acadian Building Components, which received a related party loan from NLB, making Cannon aware of the transactions. The fact that Cannon may have been aware of the transaction does not affect the outcome as it relates to the production of documents.

Garner states that Johnston did not testify, but his daughter did, and she was unable to answer questions regarding his motive. He asserts that because Johnston authored emails regarding the inspection of related party loans, he should have testified on his own behalf. Again, this testimony is not relevant to the issue of whether Plaintiffs were entitled to review the requested documents. Neither Cannon nor Johnston would have added to the testimony by the other minority members regarding the scope of the document request. This assignment of error lacks merit.

27

**CONCLUSION**

For the reasons outlined above, we affirm the trial court's judgment.

Defendants are cast with the costs associated with this appeal.

**AFFIRMED.**